**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Evans H. STARKE, Jr., Defendant–**
**Appellant.**

No. 93–2444.

United States Court of Appeals,
Eleventh Circuit.

Sept. 7, 1995.

**1376**

Robert Augustus Harper, Tallahassee, FL, for appellant.

R. Jerome Sanford, Asst. U.S. Atty., Gainesville, FL, for appellee.

Before COX, BLACK and BARKETT, Circuit Judges.

COX, Circuit Judge:

## I. INTRODUCTION

Evans H. Starke, Jr. was convicted of 12 counts of money laundering in violation of 18 U.S.C. § 1956(a)(3)(B), sentenced to 57 months imprisonment, and fined $30,000.[1] On appeal, Starke challenges the district court's jury instructions, contending that the court's deliberate ignorance instruction was erroneous. Starke also challenges the sufficiency of the evidence, contending that the evidence does not support a finding that Government agents represented to him that the money was proceeds from narcotics trafficking. Starke also contends that there is insufficient evidence that he believed the money was proceeds from narcotics trafficking. Finally, Starke contends there is insufficient evidence to support a finding that he concealed or disguised his monetary transactions, as required for a money laundering conviction under § 1956(a)(3)(B). We affirm.

## II. BACKGROUND

Starke owned and operated a motel and restaurant in Waldo, Florida. The Florida Department of Law Enforcement began investigating Starke after being informed that drugs were being sold from Starke's establishment.[2] The Government set up a reverse sting operation in which Leroy Ellis, a confidential informant, introduced Starke to agent James Lockley, who posed as James Ellis, Leroy's brother.[3] Lockley told Starke that he was a trucker, and arranged a deal in which he sold some meat to Starke. At the time of delivery, Lockley allegedly told Starke that the meat had been stolen.[4] Later, Starke arranged a purchase of stolen beer from Lockley and Ellis.

Soon thereafter, Lockley and another undercover agent, Michael Palmer, met with Starke in an effort to get Starke to launder money for them. At first, Palmer asked Starke if he would be interested in selling the restaurant to Palmer. Starke responded

---

1. Starke was also charged, along with several co-defendants, with conspiracy to launder money in violation of 18 U.S.C. §§ 1956(a)(3)(A), (B), and conspiracy to possess with the intent to distribute a controlled substance in violation of 21 U.S.C. § 846. The district court acquitted all the defendants on these two counts.

2. The Government's intelligence did not indicate that Starke was selling drugs; rather, the reports indicated merely that drugs were being sold on his property.

3. Before introducing Lockley to Starke, Leroy Ellis unsuccessfully attempted to engage in drug transactions with Starke.

4. According to Starke, he was under the impression that the meat came from an overage on deliveries. In other words, Starke claims he thought he had purchased extra meat from Lockley's truck which had not been included on the invoice for one of Lockley's deliveries. The meat Starke purchased was worth approximately $400. Starke paid approximately $150 for it.

that he might be interested in selling when the business started to make a profit. Palmer indicated that they had "accumulated a large amount of currency and need[ed] to see about investing it." (Gov't Ex. 3–T at 43.) Palmer asked Starke if Starke could help them "clean[ ] up some money and open[ ] up ... a business or whatever." (*Id.* at 47.) Starke told them that opening up a business was a good idea because it would give them a legitimate explanation for having large amounts of cash. Noting that opening up a business was long term, Palmer asked Starke if he could help them "get some clean checks" in the short term. (*Id.* at 65.) After a number of discussions, Starke took $25,000 in cash from the agents and gave the agents two cashier's checks totalling $25,000, which Starke had obtained from his bank. Starke had the agents wait in the car while he conducted the transaction with the bank. Starke informed the agents that he would charge at least a ten percent fee for his services because of the risk involved. He received $2,500 from the agents for this first transaction. Over the next several months, Starke engaged in a substantial number of similar transactions, taking cash from the agents, giving them cashier's checks in return, and charging a ten percent fee for his services. Starke often deposited the agents' money in his bank accounts in various increments under $10,000 to avoid the filing of transaction reports as required by 31 U.S.C. § 5313.[5]

During these discussions, the agents never explicitly told Starke that the money they were exchanging for cashier's checks came from drug transactions. Agent Lockley testified at trial that in the real world, a narcotics trafficker would not directly tell someone that he or she was in the narcotics business. Therefore, Lockley maintained that the agents had to represent themselves to Starke as narcotics traffickers through their actions, speech, and demeanor without directly telling him they were involved with drugs.

At trial, the agents insisted that Starke had believed they were narcotics traffickers. Agent Lockley asserted that he had represented himself as a drug trafficker to Starke by "the demeanor in which [Lockley] presented [him]self, the vehicle that [he] drove, [and] the way [he] conducted [him]self." (R. 12 at 69.) Lockley claimed that several factors had contributed to his representation to Starke that he was a drug trafficker. Lockley testified that the hours he kept were indicative of a drug trafficker because he was not "strictly an eight-to-five individual." (*Id.*) He drove a late model Jaguar, trimmed in gold, which he asserted was indicative of a narcotics trafficker. In addition, another agent wore a Rolex watch. One of the agents had joked in Starke's presence that when people asked him what he did for a living, he told them, "I buy and sell property." (Gov't Ex. 27–T at 39.) Agent Lockley testified that he was convinced, personally, "in talking to Mr. Starke, ... looking at the demeanor, looking at eye contact; gestures that were made—that he was aware of the line of work that we were in and what we were talking about." (R. 12 at 90.)

Starke testified, however, that the agents held themselves out to be truckers. He stated that he had no idea the undercover agents were drug dealers until March 17, 1992, after all the alleged money-laundering transactions had taken place. Starke testified that he thought the money "came from the trucking business" and was a "by-product[ ] of, at most, stolen goods that were sold and turned into cash." (R. 18 at 44.) Starke admitted that he never asked the agents any questions about their business. Starke also admitted that he knew the money had been derived from illegal activity and that he helped "legitimize" the cash. Starke testified that at the time he was dealing with the agents he had thought that the transactions enabled the agents "[t]o take unreported monies from their trucking business and to get checks; whereby, they could utilize that money, without suspicion." (*Id.* at 93.) At trial, he

---

5. Section 5313(a) and 31 C.F.R. § 103.22(a)(1) require domestic financial institutions to file currency transaction reports with the IRS when they engage in individual currency transactions exceeding $10,000. 31 U.S.C. § 5313(a); 31 C.F.R. § 103.22(a)(1); *see United States v. Breque,* 964 F.2d 381, 385 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993).

stated that he had thought this would also assist "them in avoiding paying taxes on monies that they had—or their ill gotten gains." (*Id.* at 94.)

Despite Starke's claim of ignorance, the transcripts of Starke's conversations with the agents indicate that Starke had told them that their car was too flashy and would draw attention to them. He also told the agents many stories about drug dealers who were apprehended or whose assets were seized. He relayed stories about both successful and unsuccessful narcotics dealers. Starke offered the agents much advice, counseling them to set up a corporation to help legitimatize their business. He also offered to sell his restaurant, motel, and home to the agents so they would have legitimate assets and income.

After Starke had conducted all of the alleged money-laundering transactions, the agents specifically indicated that they were dealing in cocaine by trying to involve Starke in a cocaine transaction which was to take place either at his house or his business. Although Starke claims he did not know the agents were involved in drug transactions prior to this occasion, he did not express surprise when the agents approached him about the cocaine deal. Starke initially expressed interest in the deal, and asked how much he would be paid; however, he ultimately declined to participate.

Starke was arrested and charged, among other things, with laundering money represented to be the proceeds from the distribution of a controlled substance in violation of 18 U.S.C. §§ 1956(a)(3)(A), (B). The indictment for the money laundering charge reads as follows:

### COUNTS III THROUGH XV

[The Grand Jury charges that] on or about the dates set forth below, in the Northern District of Florida, the defendant,

### EVANS H. STARKE, JR.,

knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of certain proceeds and that the property involved in the transactions was represented by a law enforcement officer to be the proceeds of some form of unlawful activity, did knowingly and willfully conduct and attempt to conduct financial transactions, to-wit: the transfer of funds by delivery of checks drawn upon financial institutions, which transactions affected interstate commerce and involved *funds which were represented to be the proceeds of a specified unlawful activity, that is, the distribution of a controlled substance,* punishable under the laws of the United States, and which transactions are more particularly described below:

. . . .

All in violation of Title 18, Unites States Code, Section 1956(a)(3)(A) and (a)(3)(B).

(R. 1–1 at 5–7) (emphasis added). At trial, the court instructed the jury only on section 1956(a)(3)(B). The court instructed that in order for the jury to find Starke guilty of violating section 1956(a)(3)(B), the Government must have proven each of the following elements beyond a reasonable doubt:

*First:* The defendant must knowingly conduct or attempt to conduct a financial transaction;

*Second:* The financial transaction or attempted financial transaction must involve *property represented by a law enforcement officer to be the proceeds of specified unlawful activity, that is, buying, selling, receiving, concealing and otherwise dealing in a controlled substance;* and

*Third:* The defendant must engage in the financial transaction with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be proceeds of specified unlawful activity.

(R. 3–144 at 9) (emphasis added). Neither the court's instruction nor the indictment is a model of clarity, and both fail to track the language of 18 U.S.C. § 1956 completely. Section 1956(a)(3)(B) provides:

(3) Whoever, with the intent—

. . . .

    (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity;

. . . .

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

18 U.S.C. § 1956(a)(3)(B). The statute provides a long list of crimes which may constitute "specified unlawful activity." *Id.* § 1956(c)(7). The list includes "the felonious . . . receiving, concealment, buying, selling, or otherwise dealing in a controlled substance." *Id.* § 1961(1)(D) (incorporated into the definition of "specified unlawful activity" through 18 U.S.C. § 1956(c)(7)(A)).

At trial, Starke claimed that he did not know that the money he had laundered came from drug transactions. The Government contended that Starke knew the source of the money, but even if he did not, it was only because he had remained deliberately ignorant of the source. Because of these contentions, the court charged the jury on "deliberate ignorance." "The term 'deliberate ignorance' 'denotes a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged, the defendant choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be caught.'" *United States v. Breque,* 964 F.2d 381, 387 (5th Cir.1992) (quoting *United States v. Chen,* 913 F.2d 183, 191–92 (5th Cir.1990)), *cert. denied,* — U.S. —, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993).

Starke objected to the deliberate ignorance instruction, but the court overruled the objection. The court instructed the jury as follows:

    When knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if the Defendant is aware of a high probability of its existence, unless he actually believes that it does not exist.

    So, with respect to the issue of a Defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that a Defendant believed that the money of the undercover agents was derived from an unlawful activity and that that Defendant deliberately and consciously tried to avoid learning that the money of the undercover agents was derived from an unlawful activity, in order to be able to say, if he should be apprehended, that he did not know the money of the undercover agents was derived from an unlawful activity, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.

    In other words, you may find that a Defendant acted "knowingly" if you find beyond a reasonable doubt either: (1) that the Defendant actually knew that the money of the undercover agents was derived from an unlawful activity[;] or (2) that he deliberately closed his eyes to what he had every reason to believe was the fact.

(R. 3–144 at 13.) The jury found Starke guilty on all of the substantive counts of money laundering under 18 U.S.C. § 1956(a)(3)(B).

### III.  ISSUES ON APPEAL

■ It is extremely difficult to discern from Starke's initial brief exactly what issues he raises on appeal. Issues that clearly are not designated in the initial brief ordinarily are considered abandoned; however, we liberally read briefs to ascertain the issues raised on appeal. *Allstate Ins. Co. v. Swann,* 27 F.3d 1539, 1542 (11th Cir.1994). In light of counsel's amplification of his position in the reply brief and at oral argument, we find that Starke raises the following issues in his initial brief. The first issue is whether the district court committed reversible error in instructing the jury on deliberate ignorance. The second issue is whether there is sufficient evidence to support Starke's conviction. Starke advances three sufficiency of the evidence arguments. First, Starke argues that the evidence fails to show that the agents represented to him that the money he alleg-

edly laundered was drug proceeds. Second, he argues that there is insufficient evidence that he believed the money to be proceeds from narcotics activity. Third, he argues that there is insufficient evidence to support a jury finding that he had "the intent to conceal or disguise the nature, location, source, ownership, or control of the money" involved in this case, as is required for a conviction under section 1956(a)(3)(B). 18 U.S.C. § 1956(a)(3)(B).

## IV.  STANDARDS OF REVIEW

■ We apply a deferential standard of review to a district court's jury instructions. So long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions. *McElroy v. Firestone Tire & Rubber Co.*, 894 F.2d 1504, 1509 (11th Cir.1990). "On appeal, we examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1569 (11th Cir.1991). However, if no objection to the instructions was raised at trial, we only review for plain error. *United States v. Andrews*, 850 F.2d 1557, 1559 (11th Cir.1988), *cert. denied*, 488 U.S. 1032, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989).

■ Whether the evidence the Government produced at trial is sufficient to support a guilty verdict is a question of law subject to de novo review. *United States v. Keller*, 916 F.2d 628, 632 (11th Cir.1990), *cert. denied*, 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724, *and cert. denied*, 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991). This court views the evidence in the light most favorable to the Government, giving the Government the benefit of all reasonable inferences and credibility choices. We will uphold the district court's denial of a motion for judgment of acquittal and the jury's guilty verdict if we find that "a reasonable factfinder could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt." *Id.*

## V.  DISCUSSION

### A.  The Deliberate Ignorance Instruction

Starke contends that the district court erred in giving the deliberate ignorance instruction because the instruction expanded the indictment. The Government contends that the district court properly instructed the jury on deliberate ignorance. "A constructive amendment to the indictment occurs where the jury instructions 'so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment.'" *United States v. Lignarolo*, 770 F.2d 971, 981 n. 15 (11th Cir.1985) (quoting *United States v. Ylda*, 653 F.2d 912, 914 (5th Cir.1981)), *cert. denied*, 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986). In the deliberate ignorance instruction, the court stated that the "Defendant acted knowingly if . . . [he] actually knew that the money of the undercover agents was derived from *an unlawful activity* . . . or . . . he deliberately closed his eyes to what he had every reason to believe was the fact." (R. 3–144 at 13) (emphasis added). However, the indictment in this case alleges that the funds involved "were represented to be the proceeds of a specified unlawful activity, that is, the distribution of a controlled substance." (R. 1–1 at 6.)

Starke argues that the deliberate ignorance instruction constructively amended the indictment by modifying the element of the offense which required the jury to find that Starke believed the funds he laundered were proceeds of the distribution of a controlled substance. According to Starke, this allowed the jury to convict him on grounds broader than those specified in the indictment, permitting a conviction if the jury found that Starke believed the funds were proceeds from *any* unlawful activity whether or not he believed they were proceeds from the distribution of a controlled substance.

■ Although Starke objected to the deliberate ignorance instruction at trial, the argument he advanced at trial is not the argument he advances on appeal.[6]  In order

---

**6.** Starke's counsel made the following objection to the deliberate ignorance instruction at trial:

MR. VIPPERMAN: Let me state—my problem is, is that it is on the record. We have a

to preserve an objection to jury instructions for appellate review, a party must object before the jury retires, stating distinctly the specific grounds for the objection. Fed. R.Crim.P. 30; *E.g. United States v. Dorri,* 15 F.3d 888, 891 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 521, 130 L.Ed.2d 426 (1994); *United States v. Oakie,* 12 F.3d 1436, 1442 (8th Cir.1993); *see also United States v. Meester,* 762 F.2d 867, 879–880 (11th Cir.), *cert. denied,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985). Because a specific objection on this issue was not made at trial, we will only review for plain error. *See Meester,* 762 F.2d at 880. "Jury instructions will not be reversed for plain error unless 'the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice,' or the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Pepe,* 747 F.2d 632, 675 (11th Cir.1984) (quoting *United States v. Thevis,* 665 F.2d 616, 645 (5th Cir. Unit B), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 *and cert. denied,* 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370, *and cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)).

■ Although the deliberate ignorance instruction would have been clearer had the district court defined the "specified unlawful activity" as part of the deliberate ignorance instruction, as it had been set forth in the indictment and in § 1956(a)(3)(B), the court's failure to do so does not constitute plain error. Looking at the instructions as a whole, we find that the district court conveyed to the jury that they were required to find that Starke believed the money to be

proceeds of narcotics activity in order to convict. In reciting the elements of the crime, the court instructed the jury that "[t]he defendant must engage in the financial transaction with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be proceeds of specified unlawful activity." (R. 3–144 at 9.) The court also stated that "[t]he term 'specified unlawful activity' in this case means buying, selling, receiving, concealing and otherwise dealing in a controlled substance." (*Id.* at 11.) In its closing argument, the Government argued that Starke knew the money came from drug proceeds. In light of all of this, we hold that the reference to "an unlawful activity" in the deliberate ignorance instruction did not constitute plain error.

### B. Sufficiency of the Evidence

#### 1. The Representation Element

Starke contends that the evidence concerning the agents' representations regarding the source of the laundered funds were insufficient, as a matter of law, to support his conviction for laundering drug proceeds. Starke asserts that the agents represented themselves as truckers, and that they did not use the term "drugs" until after the last money laundering transaction had taken place. Starke also argues that the agents' representations were too subtle to satisfy the provisions of § 1956(a)(3) because the agents merely hinted to Starke that the money involved in this case came from narcotics trafficking.

The Government contends that the agents need not recite the specific alleged illegal

---

statute that sustains that, and it was very specially, carefully drafted out by Congress. It was not until 1988 that they drafted the statute.

This statute requires that the law enforcement officer represent specified activities. We are suddenly broadening this statute, tremendously, by allowing the law enforcement officer to make inferences about specified activities; then to say they created deliberate ignorance. The only protection for any citizen of the United States is on the strange side, in that it allows the officer to lie. He ought to at least be required to make up a lie that he has to rely on; with my client, in fact believing, as stated

in the statute. It's not mere knowledge that is being inferred. It's not knowledge of the representation, but it is the belief.
(R. 18 at 141–42.) The objection asserted at trial, therefore, is that the deliberate ignorance instruction relieved the Government of its burden of proving that the agents actually represented to Starke that the money was drug proceeds. Defense counsel argued that this would allow the jury to convict if the jurors believed that the Government merely hinted to Starke about the nature of the money, and Starke, believing the funds to be drug proceeds, deliberately remained ignorant of the source of the funds. This is not the argument Starke advances here.

source of the money to the defendant in order to satisfy the representation element of § 1956(a)(3). It is enough, the Government argues, that the law enforcement officers make the defendant aware of circumstances from which a reasonable person would infer that the property was drug proceeds. The Government argues that although the agents did not specifically mention drugs until after the money was laundered, the agents, through their language, appearance, and conduct, represented themselves to Starke as drug traffickers.

In order to convict a defendant of money laundering under 18 U.S.C. § 1956(a)(3)(B), the laundered property must be "represented to be the proceeds of specified unlawful activity ... by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of [§ 1956(a)(3) ]." 18 U.S.C. § 1956(a)(3). This circuit has not yet addressed whether, in order to satisfy this element of the statute, the Government agents must specifically state that the money came from the specified unlawful activity. Both the Fifth and Seventh Circuits, however, have addressed this issue, concluding that the representation element is satisfied if the Government proves that the agents made the defendant aware of circumstances from which a reasonable person would infer that the money was proceeds from the specified unlawful activity. *E.g. United States v. Castaneda–Cantu,* 20 F.3d 1325, 1331 (5th Cir.1994); *United States v. Kaufmann,* 985 F.2d 884, 892 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2350, 124 L.Ed.2d 259 (1993).

▪▪▪ "A representation is '[a]ny conduct capable of being turned into a statement of fact.'" *Kaufmann,* 985 F.2d at 892 (quoting BLACK'S LAW DICTIONARY 1301 (6th ed. 1990)). Thus, a representation encompasses a broader range of communication than specific statements. *Id.* We do not believe, therefore, that Congress intended that the representation element in § 1956(a)(3) be narrowly construed so as to require an express statement by Government agents that the money came from narcotics activity.

To hold that a government agent must recite the alleged illegal source of each set of property at the time he attempts to transfer it in a "sting" operation would make enforcement of the statute extremely and unnecessarily difficult; "legitimate criminals," whom undercover agents must imitate, undoubtedly would not make such recitations before each transaction.

*United States v. Arditti,* 955 F.2d 331, 339 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 597, 121 L.Ed.2d 534 (1992), *and cert. denied,* —— U.S. ——, 113 S.Ct. 980, 122 L.Ed.2d 134 (1993). We hold, therefore, that in order to satisfy the representation element of § 1956(a)(3), the Government need only prove that a law enforcement officer or other authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was drug proceeds. *See Castaneda–Cantu,* 20 F.3d at 1331; *Kaufmann,* 985 F.2d at 892; *United States v. Breque,* 964 F.2d 381, 386 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993); *Arditti,* 955 F.2d at 339. When evaluating the representations made by law enforcement agents, we note that language which might be ambiguous to a person unfamiliar with illicit activity may not be ambiguous to a person involved in such activity. *Castaneda–Cantu,* 20 F.3d at 1331. By considering the defendant's familiarity with illicit activity we do not suggest that the test is subjective; the test is objective, but the reasonable person of whom we speak is one possessing the knowledge that the defendant possessed. *Cf. Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987) (holding that to determine whether an officer had qualified immunity in a warrantless search case, the court applies an objective test in which the court determines whether a reasonable officer could have believed the warrantless search to be lawful in light of clearly established law *and the information the searching officer possessed* ).

▪▪▪ Applying this standard to the facts of this case, we find the evidence sufficiently supports an inference that the agents represented the source of the money to be narcotics activity. Although the agents did not explicitly tell Starke that they were drug

dealers, their appearance, actions, and words could convey to a reasonable person who is familiar with illicit activity that they were drug dealers and that the money they needed to launder was drug proceeds. Additionally, Starke's behavior and the evidence relative to statements made by him support an inference that such a representation had been made.

Agent Lockley asserted that he had represented himself as a drug trafficker to Starke by his demeanor, the vehicle he drove, and the way he conducted himself. Lockley claimed that several factors had contributed to his representation to Starke that he was ·a drug trafficker. Lockley testified that the hours he kept were indicative of a drug trafficker. He drove a late model Jaguar, trimmed in gold, which he asserted was indicative of a narcotics trafficker. In addition, another agent wore a Rolex watch. When asked why the agents didn't specifically tell Starke that they were in the cocaine business, Agent Lockley stated that a narcotics trafficker would not directly tell someone that he traffics in drugs: "[W]hen you are meeting someone new that is in the business, in the narcotics trafficking business ... you ... basically lay out a frame work [sic] and give hints around it ... neither party would basically verbalize what he or she is doing." (R. 12 at 91.)

In an initial conversation with Starke, the agents indicated that they were beginning to generate large amounts of money, but they were running out of places to put it. They asked for Starke's help "in establishing our objectives as it relates to—uh—you know, cleaning up some money and opening up maybe a business or whatever." (Gov't Ex. 3–T at 47.) In addition, at several points during the meeting, the agents expressed apprehension when they saw people they suspected to be police officers. At the end of the meeting one agent stated, "Hey, speaking of it—do you think we could meet some place else, you know, all these policemen kind of worry me a little." (Id. at 96.)

Starke's behavior and interaction with the agents supports an inference that the agents effectively represented the money to be drug proceeds. Throughout the initial conversation with the agents, Starke gave the agents advice, at one point telling them that the Jaguar with gold trim was not good, because it would apparently attract attention to them. He later pointed out the "unassuming vehicle" of a man he stated was a cocaine dealer, indicating that was a more preferable mode of transportation. The agents asked Starke if the cocaine dealer might be able to·help them, and Starke said.no, "you cannot afford the risk. I don't know him that well." (Id. at 87.)

Throughout the meeting, Starke advised the agents on how to conduct themselves and how to create the appearance of a legitimate source of income, often by telling them stories about different drug dealers. In addition, at one point Starke advised them to set up a corporation "to remove—uh—yourself from—uh. legal—direct legal responsibility," indicating that his son, a lawyer, could help them do that. (Id. at 48.) The agents asked Starke if they could talk· freely about the source of their income with his son. Starke responded, "That is not his business.... Don't tell nobody nothing that—uh—he don't need to know." (Id. at 72.) Finally, in order to help legitimize the agents' income, Starke offered to get them checks for their money. He indicated he would charge them a ten percent fee because of the risk he was taking.

Although during these conversations the agents did not explicitly state that they were drug dealers, the conversations between Starke and the agents are filled with references and allusions to narcotics activity. From the overall tone of these conversations, it is apparent that the agents effectively communicated that they were drug dealers and that they needed his help in "legitimizing" the proceeds from their narcotics activity. Therefore, we hold that there is sufficient evidence for a reasonable jury to conclude that the agents represented to Starke the money he was to launder was proceeds from narcotics activity.

### 2. The Belief Element

The offense in question also requires the Government to prove, as the jury was instructed, that the defendant believed the

property to be the proceeds of specified unlawful activity. 18 U.S.C. § 1956(a)(3)(B); (R. 3–144 at 9). Construed liberally, we find that Starke's brief contains a contention that the Government presented insufficient evidence that Starke believed the agent's alleged representations that the money came from drug activity. The evidence we have discussed regarding Starke's behavior and interaction with the agents supports the conclusion that Starke believed the Agents' representations to be true. Accordingly, we find that a jury could reasonably conclude, beyond a reasonable doubt, that Starke believed the property to be the proceeds of narcotics activity.

### 3. The Intent to Conceal or Disguise

Starke contends that there is insufficient evidence to support a jury finding that he had "the intent to conceal or disguise the nature, location, source, ownership, or control of the money" involved in this case, as is required for a conviction under 18 U.S.C. § 1956(a)(3)(B). Starke argues that section 1956(a)(3)(B) applies only to situations in which the transaction was intended to conceal the identity of the participants. Starke contends that he personally purchased all of the cashier's checks, that the checks were made payable to himself, and that they were restrictively indorsed to the order of one of the law enforcement agents. He argues, therefore, that he had no intent to conceal or disguise the identity of the participants in the transaction.

■■■■ The Government contends, however, that a money laundering transaction need not conceal the identity of the participants in the transaction. The Government argues that evidence that the transactions were designed to conceal the funds or the source of the funds is sufficient to support a conviction under section 1956(a)(3)(B). We agree with the Government. Section 1956(a)(3)(B) specifically indicates that the concealment element is satisfied if the jury finds that the defendant had the intent "to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(3)(B). Finding the evidence regarding Starke's intent to conceal to be sufficient, we affirm the denial of Starke's motion for judgment of acquittal.

## VI. CONCLUSION

We conclude that the jury instructions in this case, taken as a whole, sufficiently informed the jury that Starke could only be convicted if the jury found that he engaged in a financial transaction with the intent to conceal or disguise the nature, location, source, ownership, or control of property he believed to be derived from drug transactions, the specified unlawful activity in this case. Therefore, we find no plain error.[7] In addition, we find that there is sufficient evidence for a reasonable jury to conclude that the agents represented to Starke that the money to be laundered was drug proceeds, that Starke believed the money was drug proceeds, and that Starke had the intent to conceal or disguise the nature, location, source, ownership, or control of the money involved in this case, as is required for conviction under 18 U.S.C. § 1956(a)(3)(B).

AFFIRMED.

---

7. In reviewing the deliberate ignorance instruction, we have addressed only the arguments Starke makes on appeal. We should not be understood as having approved the instruction at issue.