[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-12331
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 1, 2010
JOHN LEY
CLERK

D.C. Docket No. 06-01741-CV-T-23-MAP

SUSAN KEMBERLING,
JOHN CIAMBRONE,
EDWARD KAUPLA,
as Co-Trustees of the Kemco Charitable
Trust Dated February 2, 1998,

Plaintiffs-Counter-Defendants-Appellants,

versus

METLIFE LIFE AND ANNUITY COMPANY OF CONNECTICUT,

Defendant-Counter-Claimant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 1, 2010)

Before MARCUS and HILL, Circuit Judges, and VOORHEES,* District Judge.

_____

*Honorable Richard L. Voorhees, United States District Judge for the Western District of
North Carolina, sitting by designation.

HILL, Circuit Judge:

Sue Kemberling, John Ciambrone and Edward Kaupla, co-trustees of the Kemco Charitable Trust dated February 2, 1998 (the "Trust"), brought this action against MetLife Life and Annuity Company of Connecticut ("MetLife") for breach of contract by failure to pay the proceeds of a life insurance policy issued by MetLife to Lee Kemberling, naming the Trust as beneficiary.[1] MetLife counterclaimed against the Trust for rescission of Kemberling's life insurance policy. After a trial, the jury returned a verdict for MetLife. The Trust appealed. For the following reasons, we affirm.

## I.

In 2005, Lee Kemberling was a seventy-nine-year-old successful engineer and businessman. He was chief executive officer of Kemco Systems, Inc. ("Kemco"), a 100-employee company in Clearwater, Florida, which he had founded thirty years earlier. Kemberling had, however, a variety of serious medical issues, including hypertensive cardiovascular disease, high and abnormal cholesterol, high and abnormal triglycerides, and, high and abnormal blood pressure.

---

[1] The policy was issued by Travelers Life and Annuity Company (Travelers) to Kemberling on April 13, 2005. MetLife acquired Travelers on July 1, 2005, and assumed all its obligations under the policy.

As the bulk of Kemberling's wealth was held in illiquid Kemco stock, his estate planning portfolio consisted of a large percentage of life insurance, as a means to pay estate taxes and to provide financial security for his family after his death. However, most of these policies were second-to-die policies, leaving his wife vulnerable should he predecease her, without adequate liquidity to maintain her lifestyle and pay the premiums on the second-to-die policies.[2] In 2004, Kemberling's advisors suggested additional term insurance to eliminate that exposure.

Kemberling consulted Wayne Weaver, an independent insurance broker doing business as First Financial Resources, a sole proprietorship, in Clearwater, Florida, who had previously secured life insurance policies for him. In fact, since 1997, Weaver had obtained approximately $40 million in life insurance coverage for Kemberling, from at least seven different insurance carriers. MetLife was not one of those carriers.

Weaver approached at least five insurance carriers seeking to acquire $10 million in life insurance benefits on Kemberling's life alone. Despite his multiple health issues, he was pre-approved by MetLife for purchase of a life insurance

---

[2] A second-to-die life insurance policy is a two-person life insurance policy which pays only after both insureds have died.

policy.[3]

Upon his pre-approval, on March 10, 2005, Kemberling signed a blank MetLife application form entitled "Part One Application for Life Insurance." He did not complete the form. Above Kemberling's signature was a declaration stating, in relevant part:

> (c) No agent is authorized: (1) to make, alter or discharge any contract; (2) to waive or change any condition or provision of any contract, application, or receipt; or (3) to accept any risk or make any decision concerning insurability.

On that same day, Weaver executed a Life Producer Contract (the "Contract") with MetLife. In the Contract, MetLife and Weaver agreed that, subject to the limitations in the Contract, Weaver would "act as [its] agent for the purpose of soliciting applications for . . . [MetLife] products," and to "collect the first or single premiums with an application and any other premiums [MetLife] may ask you to collect." The Contract authorized Weaver to act as MetLife's "agent under applicable state insurance laws to solicit, negotiate and effect the contracts contemplated hereunder." Weaver submitted Kemberling's insurance

---

[3]The record is clear that MetLife's underwriters pre-approved Kemberling based upon their review and receipt of: a December 2004 medical questionnaire; a December 2004 EKG stress test; a urinalysis; his blood test results; statements from Kemberling's personal physician; and, Kemberling's medical records for the last ten years, which revealed his hypertension, cardiovascular disease, cholesterol problems, and high blood pressure.

application to MetLife.

Two days after submission of the application, on March 12, in response to a newspaper ad, Kemberling drove to a church for a full body scan by Life Line Screening, which included a screening of his carotid arteries. On March 23, 2005, the Life Line Screening Report was delivered to Kemberling's home by Federal Express. The report described a "finding of possible significance" related to his right carotid artery.

One month later, on April 13, MetLife issued the $10 million life insurance policy to Kemberling. The policy required an annual premium payment of $720,000, with an initial payment of $60,000, due on the date of issuance. The policy contained the following "Coverage Effective Date Endorsement":

> No insurance will take effect prior to the later of the Issue Date or the Policy Date shown on the Policy Summary. Insurance issued will take effect on the later of the Issue Date or the Policy Date shown on the Policy Summary if, on the later of the Issue Date or the Policy Date, *the health and other conditions relating to insurability remain complete and true as described in the application for this policy* (emphasis added).

On April 20, Weaver delivered the policy to Kemberling. One week after that, on April 27, Kemberling had an appointment with his personal physician and questioned him about the screening report. The physician referred him to a specialist.

On May 11, Kemberling met with the specialist. Although the specialist considered Kemberling asymptomatic of carotid disease, he recommended a definitive ultrasound. On May 23, Kemberling had a definitive cerebrovascular duplex scan. On July 14, the specialist informed Kemberling that he had carotid stenosis of the right carotid artery, with a blockage ranging from 80% to 99%.

On August 23, Kemberling informed Weaver of the carotid artery screening and subsequent diagnosis.[4] Three months later, in November , Kemberling died from causes unrelated to his carotid artery. As Kemberling died prior to the effective date of the policy's two-year incontestability clause, MetLife conducted a routine investigation into the circumstances surrounding Kemberling's death and the issuance of the policy.[5] In July 2006, MetLife rescinded Kemberling's policy, denying coverage on the ground that the policy never went into effect as Kemberling failed to disclose the Life Line Screening test. Two months later the Trust brought this action.

At the conclusion of the trial, the district court rejected the Trust's request

---

[4] As owner of the policy, the Trust paid MetLife a total of $675,000 in premiums from the date the policy was issued in April 2005, to Kemberling's death in November 2005. Of that, some $615,000, or 90%, of these premiums were accepted by MetLife after August 2005, the date Kemberling informed Weaver of the carotid artery screening and subsequent diagnosis.

[5] An incontestability clause in an insurance policy prevents an insurer from revoking coverage because of alleged misstatements by the insured after a specified period, in this case, two years.

that it instruct the jury they could find that Weaver was MetLife's actual or apparent agent after delivery of the Policy so that his knowledge of the Life Line Screening Test result could be imputed to MetLife, thereby effectuating coverage under the policy. In so ruling, the court stated:

> Although an insurer has constructive knowledge of facts disclosed to its agent while acting within the scope of his agency, *a reasonable jury could not have concluded from the evidence adduced at trial that Kemberling disclosed the pertinent information to Weaver when Weaver acted as MetLife's authorized agent.* Weaver's actual authority to act for MetLife is defined in the Life Producer Contract, which authorizes Weaver to solicit applications, to submit completed applications to MetLife, to collect first or single premiums along with a policy application, and to collect such subsequent premiums as MetLife asks Weaver to collect. After Weaver completed the only acts he was authorized to perform, Weaver's authority under the Life Producer Contract to act for MetLife with respect to the Kemberling policy ceased, and - absent some other source of actual or apparent authority - he reverted to the role of a broker acting solely on behalf of his long-time client Kemberling . . . Because the record includes no other evidence of Weaver's actual or apparent authority to act for MetLife with respect to the Kemberling policy and no evidence that Weaver learned about the Life Line screening during his service as a soliciting agent, any information Weaver may have obtained from Kemberling after the issuance of the policy could not be imputed to MetLife.

The district court, therefore, removed the issue of Weaver's agency status with MetLife from the jury's consideration. This is the primary issue on appeal.[6]

---

[6]The jury may have been entitled to find for the Trust on its other theory of coverage, namely, that Kemberling had no duty to supplement the initial application. The jury found, however, that Kemberling made a material misrepresentation to MetLife by failing to notify it of

7

II.

We review the district court's denial of a motion for judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the non-moving party. *D'Angelo v. School Bd.*, 497 F.3d 1203, 1208 (11th Cir. 2007). We review the district court's refusal to give a proposed jury instruction for abuse of discretion. *Palmer v. Bd. of Regents,* 208 F.3d 969, 973 (11th Cir. 2000). Under this deferential standard, we will reverse "if we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1005 (11th Cir. 1997). The jury charge must be considered as a whole. *United States v. Starke*, 62 F.3d 1374, 1381 (11th Cir. 1995). There is no requirement to submit a question to the jury unless the evidence is of such a character that it could warrant the jury in finding a verdict [on that question] in favor of the requesting party. *Anderson v. Liberty Lobby Inc.,* , 477 U.S. 242, 250-51 (1986). A district court does not abuse its discretion in refusing to instruct the jury on an issue not properly supported by the record. *Id.*

---

the Life Line screening or its results, and entered a verdict for MetLife on its counterclaim for recision of the contract. We find no merit to the Trust's appeal of the district court's refusal to direct a verdict for it on the duty to supplement issue. Nor do we find any merit in the claim that the district court abused its discretion if refusing several requested jury instructions on this issue. Nor did the district court abuse its discretion in permitting the testimony of Eugene Zimmerlink as to industry underwriting guidelines, a topic well within his personal knowledge.

Our review of the record in this case supports the district court's ruling that there was insufficient evidence upon which to instruct the jury that they were entitled to find that Weaver was MetLife's agent at the time he learned of Kemberling's Life Line test results. First, the record evidence is clear that Weaver was an independent insurance agent/broker, not the general agent of MetLife. *See Amstar Ins. Co. v. Cadet*, 862 So.2d 736, 739 (Fla. 3d DCA 1997).[7] Weaver was not bound by contract to work for or solicit insurance for MetLife only. Indeed, Weaver had secured life insurance coverage from numerous other insurance companies for Kemberling and his family over the prior seven years. Weaver testified that he was a middleman acting in the best interests of Kemberling.

Furthermore, the Contract between MetLife and Weaver specifically identified Weaver as an independent contractor and not an employee of MetLife. Weaver was not even able to directly contact MetLife, instead having to go through his brokerage general agent, Albert Banks and a brokerage general agency called Advanced Planning Services ("APS"). Of the hundreds of insurance policies sold by Weaver, this was the first and only MetLife policy he sold. Therefore, Weaver was an independent agent/broker.

---

[7]Although the issue of the applicable law was never decided by the court, the parties agree that the Florida and Wisconsin law of agency is "essentially the same" on agency and recession.

9

During the process of applying for the MetLife policy, the parties agree that Weaver acted as MetLife's agent. The Contract between Weaver and MetLife, however, strictly limited Weaver's authority to three things: the solicitation of applications; the taking of applications; and, the collection of initial premiums. Once these things were accomplished, the Contract specifically prohibited Weaver from making, altering or discharging any contract of insurance; waiving or changing any condition of any contract, application, or receipt; or accepting any risk or making any decision concerning insurability." MetLife, therefore, *explicitly* disavowed any intention to be bound by Weaver's actions after issuance of the policy. The Contract gave Weaver no authority to bind MetLife or to undertake any acts after issuance of the policy in the absence of an *explicit* request by MetLife.

In *Amstar Ins. Co.*, the insurance application stated that the putative agent had the "authority to solicit, receive, and transmit applications for insurance contracts, but had "no right" to "make, alter, modify or discharge any contract or policy issued on the basis of this application." 862 So.2d at 740. This language was found to put the insured on notice of the limitations on the putative agent's authority to act on behalf of the insurer. *Id.*

This same language is found in the MetLife policy application signed by

10

Kemberling. It, too, put Kemberling on notice that Weaver had no authority to act on behalf of MetLife after the policy was issued. There was no evidence, therefore, from which a reasonable jury could have concluded that Weaver was either MetLife's agent – actual or apparent – after the issuance of the policy.[8]

In the absence of evidence that Weaver was some sort of agent for MetLife after the policy issued, there is no basis for imputing Weaver's knowledge of the Life Line test results to MetLife. The Contract explicitly stated that Weaver could not accept risks, make or alter policies, extend policy obligations, or incur liabilities for MetLife. We have long ago recognized that "Florida case law acknowledges the general principle of agency law that knowledge of, or notice to an agent or employee is imputed to the principal [only] when it is received by the employee within the scope of her employment, and when it is in reference to matters over which the employee's authority extends." *Computel, Inc. v. Emery Air Freight Corp.*, 919 F.2d 678, 685 (11th Cir. 1990). As the district court held, "[a]fter Weaver completed the only acts he was authorized to perform, Weaver's authority under the Life Producer contract to act for MetLife with respect to the

---

[8]The Trust argues that Weaver's provision to Kemberling of certain illustrations about amendments to the policy after it was issued, on stationery bearing the MetLife letterhead, proves their claim of apparent agency. The evidence is that Weaver ran these illustrations for his own benefit and not at the request of MetLife. In fact, Weaver had to go through APS to even request the illustrations. He could not go directly to MetLife. This evidence does not support apparent agency.

11

Kemberling policy ceased, and . . . he reverted to the role of a broker acting solely on behalf of his long-time client Kemberling."

Since, one cannot bind the insurer when the insurance application makes it clear that there is no authority to do so, the district court correctly held that there was no evidence in the record that Weaver had any sort of authority to act for MetLife after the policy was issued, and, therefore, information Weaver may have obtained from Kemberling after the issuance of the policy could not be imputed to MetLife.

The jury found that Kemberling was obliged to tell MetLife about the carotid artery screening and that his failure to do so entitled MetLife to rescind the policy. We agree.

III.

We affirm the judgment of the district court in favor of MetLife and against the Trust.

AFFIRMED.

12