[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-12605

_____

D.C. Docket No. 00-00933-CR-SH

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 12, 2003
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAURICIO JAVIER PUCHE,

Defendant-Appellant.

_____

No. 02-12606

_____

D.C. Docket No. 00-00933-CR-SH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ENRIQUE ALFONSO PUCHE,
ORLANDO E. PUCHE,

Defendants-Appellants.

_____

No. 02-14586
_____

D.C. Docket No. 00-00933-CR-SH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GLORIA EXCHANGE CORPORATION,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(November 12, 2003)**

Before HULL, MARCUS and STAHL[*], Circuit Judges.

STAHL, Circuit Judge:

Defendants-appellants Enrique Puche, Mauricio Puche, Orlando Puche, and

Gloria Exchange Corporation (GEC) appeal from their convictions and sentences

on one count of conspiracy to commit money laundering, in violation of 18 U.S.C.

---

[*]Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

§ 1956(a)(3) & (h). In addition, they appeal from a forfeiture order, entered by the district court pursuant to 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853, finding them jointly and severally liable in the amount of $1,628,693.20 for money used in the offense and money involved in each financial transaction that defendants had conspired to conduct. Defendants contend that: (1) the evidence at trial was insufficient to support their convictions; (2) the district court erred on three particular jury instructions; (3) the district court abused its discretion by admitting certain evidence at trial; (4) the district court erred when it replaced a juror with an alternate; (5) the forfeiture order was improper; and (6) the district court improperly sentenced all three individual defendants.[1]

## I. BACKGROUND

We set forth the trial evidence in the light most favorable to the government. United States v. Miles, 290 F.3d 1341, 1355 (11th Cir.), cert. denied, 537 U.S. 1089 (2002).

The facts in this case are many and detailed, as defendants' convictions rest principally on circumstantial evidence gained from a series of meetings between defendants and DEA undercover agents. The Puches owned and operated GEC, a

---

[1] In their briefs, Mauricio and Orlando present no separate arguments of their own with regard to sentencing, and instead adopt Enrique's argument in Section III of his brief.

money transmittal company located in Miami, Florida.[2]  Mauricio was primarily responsible for advertising GEC's services, while Orlando maintained principal authority over disbursement and transfers of money.  Enrique supervised the staff at GEC, conducted banking business, and ran errands.  Co-defendant Wilder Moreno was GEC's manager.  Enrique, the titular head of the company, is the father of Mauricio and Orlando.

The DEA "sting" operation began in early 1999 with an investigation of United Express, another money transmittal company.  Detective Elio Oliva of the Sunny Isles Police Department, as "Leonardo Casamayor," posed as a drug dealer responsible for collecting cash from various drug sales locations and forwarding the money to overseas accounts.  DEA Special Agent Luis Miranda, as "Luis Pacheco," posed as Casamayor's drug business employee.  Between July of 1999 and September of 2000, Oliva visited United Express thirty times to exchange cash in small bills into larger denominations so that he could more easily conceal the money or transport it outside the United States.  Through United Express's owner, Ana Arbelaez, Oliva met Zaidy Rojas and Sandra Serna-Osorio, whom Arbelaez identified as people who helped her out by bringing her $100 bills.

---

[2]A money transmittal company is a non-bank financial institution that sells money orders, cashes checks, and sends money by wire outside the United States.

Rojas worked at GEC while Serna-Osorio worked at Variedades, a money transmittal company that operated under GEC's money transmittal license and was co-owned by Mauricio Puche and Fernando Torres. At the same time, Agent Miranda, conducting a similar investigation of Variedades, executed money exchanges through Rojas and Torres.

Eventually, Oliva went directly to Rojas at Variedades and Serna-Osorio at GEC. He spoke openly about narcotics trafficking with Serna-Osorio and Rojas and during May and June of 2000, hired them to exchange small bills for large bills in amounts ranging from $15,000 to $20,000. Both Serna-Osorio and Rojas told Oliva that they had obtained the $100 bills that they gave him from the cashier's office at GEC. Oliva paid Serna-Osorio and Rojas "under the table" for each exchange. When the agents expressed a desire to wire larger sums of money, Rojas referred them to the Puches.

On June 21, 2000, Oliva introduced himself to Orlando at the GEC's main office. Over the next three months, the agents, either individually or together, visited the GEC's main office eleven times and brought a total of $714,500 in cash on eight of those visits. The agents brought the cash in $1, $5, $10, and $20 bills, all in boxes or duffel bags. GEC deposited the cash in its own bank accounts, and

then wire-transferred the money to DEA-controlled accounts in Canada and England as designated by the undercover agents.

During their visits to the GEC office, the agents always spoke with Orlando (with the exception of August 10, 2000) and also met with Mauricio, Enrique, and Wilder Moreno on at least two occasions. The conversations were always conducted in Spanish. The agents recorded conversations during nine of those visits with devices carried on their bodies. After the conclusion of the investigation, defendants, along with thirteen co-defendants, were arrested and charged with conspiracy to money launder. All of the Puches pled not guilty. At the close of the government's case-in-chief and again at the close of all evidence at trial, defendants moved for judgments of acquittal; the district court denied their motions. The jury returned verdicts of guilty as charged for all defendants. The court then charged the jury on the forfeiture count and shortly thereafter, the jury found defendants jointly and severally liable for a money judgment, which a magistrate judge later reduced upon defendants' motion. The court sentenced Orlando Puche to 188 months' imprisonment, Enrique to 151 months, and Mauricio to 151 months, in addition to three years' supervised release for all three individual defendants.

## II. DISCUSSION

## A. Sufficiency of the Evidence

We review all the evidence <u>de novo</u> in the light most favorable to the government, drawing all reasonable inferences and credibility choices in the government's favor, to determine whether a rational jury could have found defendants guilty beyond a reasonable doubt. <u>Miles</u>, 290 F.3d at 1355.

Defendants assert that the government failed to present sufficient evidence to support a finding that law enforcement made a representation that would have reasonably led defendants to believe that the money to be wired came from illegal drug sales. In turn, they argue that without such a representation, they could not have knowingly participated in a money laundering conspiracy. After a thorough review of the record, we disagree and hold that the district court did not err in denying defendants' motions for judgments of acquittal.

To prove money laundering under § 1956(a)(3), the government must show that the defendant (1) conducted or attempted to conduct a financial transaction (2) involving property represented to be the proceeds of specified unlawful activity, (3) with the intent (a) "to promote the carrying on of specified unlawful activity," (b) "to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity," or (c) "to avoid a transaction reporting requirement under State or Federal law." 18 U.S.C. §

1956(a)(3). As used under the statute, "'represented' means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations [under § 1956.]" Id. "[I]n order to satisfy the representation element,...the [g]overnment need only prove that a law enforcement officer or other authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was drug proceeds." United States v. Starke, 62 F.3d 1374, 1382 (11th Cir. 1995) (internal citations omitted). The government agents are not required to make express statements that the money came from illegal activity. See id. To prove a conspiracy, the government must show that the individual had knowledge of the conspiracy and intended to join or associate with the objective of the conspiracy. United States v. Gold, 743 F.2d 800, 824 (11th Cir. 1984).

### 1. Defendants as a Whole

It is important to note that the government prosecuted this case under two alternate theories: that defendants actually believed that the money came from drug trafficking, or, according to a "deliberate ignorance" theory, that they deliberately closed their eyes to what they had every reason to believe was the illegal nature of the money they were wire-transferring. We first discuss the

evidence incriminating all defendants and then detail the cases against each individual defendant.

The evidence showed that in the course of the DEA investigation, GEC and the Puches were touted and known for their capacity and willingness to transmit a high volume of cash by wire. Indeed, the agents were referred to GEC after already having done business with other money transmittal companies. Previous to any meetings with the Puches, Oliva offered Rojas and Serna-Osorio opportunities to assist in his "new venture in Orlando" by transporting heroin from Miami to Orlando in hidden compartments in cars, an offer the GEC employees rejected. Serna-Osorio instead expressed interest in "the running of the money part" of Oliva's operations. Oliva told Serna-Osorio that he wanted to transfer larger amounts of cash and would prefer to visit the GEC office at least twice a week to conduct the transactions. It was then that the GEC employees, who knew of the agents' drug connections and told the agents that the Puches were "very cautious now in the way they do these things," introduced the agents to Orlando. The jury could reasonably infer that as part of this introduction, Serna-Osorio informed one, some, or all of the Puches of the agents' illegal activities.

It is equally plausible for the jury to have concluded that the Puches' suspicions should have been and were in fact aroused by the size of the cash

9

deliveries, their frequency, and the manner in which they were presented. At their first meeting on June 21, Orlando told Agent Oliva that his employee had already told him what the agents needed. Over the next three months, the agents arranged with GEC on eight occasions to have large amounts of cash, ranging from $50,000 to $170,000, wired by GEC to overseas bank accounts. The cash was always delivered in small denominations and brought in duffel bags or boxes.

Furthermore, bank records established that more than ninety-two million dollars had passed through GEC's bank accounts from May 18, 2000, through November 9, 2000. The government showed that the average amount of cash transferred by an individual customer at a money transmittal company is $250, thereby necessitating 368,000 customers in order to have transmitted the ninety-two million dollar amount in six months. In addition, Detective LuAnn Smith's testimony regarding GEC's "structuring" of its bank deposits reveals that GEC frequently made deposits of less than $10,000, thereby circumventing the requirement of submitting a currency transaction report. The structuring took the form of multiple deposits into the same bank account at different times on the same day or at different bank branches on the same day. A reasonable jury could conclude that this structuring was part of an effort to minimize suspicion over the unnaturally large amounts of money coming through GEC.

The evidence also shows that the Puches held weekly board meetings to discuss GEC's business. Though the government presented no direct evidence of whether illicit activity was discussed at those meetings, Orlando testified that "Casamayor" and "Davidoff" were mentioned and discussed. Through evidence of these meetings and by the Puches' familial associations, the jury could easily have found that Mauricio and Enrique were apprised of the content of Orlando's more frequent contacts with the agents. Yet, as we discuss infra, Mauricio's and Enrique's convictions do not lie solely on their familial connections to Orlando.

## 2. Orlando Puche

The agents had the first and most frequent contact with Orlando. At their first meeting on June 21, Orlando did not lodge any objection to Oliva's proposal to have $100,000 to $200,000 in cash wired by GEC twice a week. During the June 23 meeting, Oliva proffered various false identifications and persistently asked whether the wire transfers could be done in different names. Not giving into their repeated requests, Orlando insisted that the actual person who was wiring the cash had to come into the GEC office to conduct the transaction. Orlando also asked Oliva for his driver's license and social security number. Oliva produced a driver's license in the name of Leonardo Casamayor but claimed that he did not have his social security card on him at that time. On that occasion, Oliva left a bag

11

containing $50,000 with Orlando, instructing him to "do whatever [he] had to do." Orlando wired the money to an account in Canada that Oliva had designated. Oliva stated to Orlando that the name on the account was "Davidoff," "like the cigar company." Four days later, Serna-Osorio asked Oliva for his social security card and Oliva faxed GEC a copy of a social security card in the name of Leonardo Casamayor. The $50,000 wire transfer to Canada by GEC had occurred well before Oliva supplied his social security information to Serna-Osorio.

On June 29, Oliva returned to GEC with another $50,000 in cash to be wire-transferred. Oliva also asked Orlando whether he could exchange money for him, and remarked that he might send an emissary to do the exchange. Orlando answered that he would do it as a favor but preferred that Oliva appear personally. On July 7, Miranda, stating that he was there on behalf of "Leonardo," came to GEC with $51,530 in cash to be wire-transferred.[3] Orlando made no protest and instead came out of his office to greet Miranda and help him carry the three boxes containing the cash into his office.

On July 21, Wilder Moreno asked Oliva about his business. Oliva answered that he marketed "[d]ifferent products" and that "in Canada we are sending the

---

[3]$50,000 was the amount to be wired, $1,500 was for GEC's commission, and $30 was for the wire-transfer fee.

money to Davidoff, which is like the tobacco company." During the same conversation, Moreno asked Oliva if "they always pay you in singles," to which Oliva replied, "Hey, how they pay me, I have to take it." In Moreno's absence, Oliva pressed Orlando about why Moreno asked so many questions, and Orlando responded that he brought Moreno in to count the money because he was very quick, but also noted that Moreno was very curious about his business. Orlando strongly advised Oliva not to tell Moreno anything about his business. Oliva brought in $70,000 on that visit.

On July 28, again with concern about Moreno's inquisitiveness, Oliva intimated to Orlando that his business was "traqueteo" or drug dealing, to which Orlando responded, "No, no, no" and repeated that Oliva should not tell Moreno anything about where the money was coming from. Orlando then processed the $79,000 in cash Oliva brought in that day. On August 11, in front of Orlando, Agent Miranda remarked about receiving so many $1 bills from "Pablo's house, the crackheads up there." On that visit, Oliva brought in $100,000 to be wired. On August 25, the agents told Orlando that they wanted the cash, this time in the amount of $125,000, transferred to the Canadian account instead of the English one because the latter was too slow in releasing the money. Miranda stated that they were going to be "shorted five cosos [a slang word for kilograms of cocaine]

13

on the next shipment" because of the delay. If the jury found that Orlando actually heard these remarks, it is difficult to imagine what more the agents had to do, short of telling the Puches outright, to "represent" that the cash was coming from illegal activity.

On September 8, Oliva told Orlando that until December, he would need to transfer $400,000 to $600,000 in cash a week, and suggested that it be accomplished by dividing the amount into two transfers wired out in the same week. Orlando asked Oliva to let him know beforehand how much cash he would be bringing to GEC and recommended that he deliver the cash for transfers on Mondays and Thursdays, or Mondays and Wednesdays.

On September 25, Orlando further suggested that he did not want to do the transfers too close together. He added that Oliva should wait before bringing in the money because he wanted to hold off before dealing with the larger transfers. Orlando also notified Oliva that he was about to have two of GEC's bank accounts closed due to "too much movement" or "too much money going through his bank accounts."

During the same September 25 meeting, Orlando assured Oliva that there had not been any problems with past transactions. Previous to the meeting, GEC employee Serna-Osorio alerted Oliva that GEC had received a letter regarding

14

"Leonardo" but that she did not know the precise contents. In fact, the letter had come from the IRS, dated August 29, 2000, stating that a currency transaction report filed by GEC on June 30 for "Leonardo Casamayor" was inaccurate or incomplete because there was no match between the name reported and the corresponding social security number or employee identification number. On September 8, after having received this IRS notice, GEC still conducted another financial transaction with Oliva in his guise as Leonardo Casamayor. Orlando never questioned the agents' identities.

Overall, we have no doubt that a reasonable factfinder could have found that Orlando's suspicions were aroused and that his failure to make further inquiries amounted to deliberate ignorance. Even if the jury did not believe that Orlando heard or understood the drug-related terms used in front of him by the agents, they could have found that Orlando's requests in response to Oliva's revelation of his business and request to Oliva not to discuss his business with Wilder Moreno also amounted to deliberate ignorance. As for the "representation" element, the agents' repeated drug-related references, on top of the increasing sums of cash and Oliva's repeated attempts to use different identities, could have reasonably led the jury to conclude that the agents made enough of a representation that their money was coming from illegal activity. Defendants' argument that the agents never made

15

affirmative and explicit representations fails for its impracticability. To require "sting" operators to admit to the illegality of their business would render "sting" operations prohibitively difficult. See United States v. Starke, 62 F.3d 1374, 1382 (11th Cir. 1995) (citing United States v. Arditti, 955 F.2d 331, 339 (5th Cir. 1992)).

### 3. Mauricio Puche

The agents met with Mauricio on at least two visits, once on June 23 (when he counted $50,000 of the agents' cash with Orlando) and again on August 10. On the second visit, Agent Miranda complained to Mauricio about the length of time it had taken the money to arrive in some of the overseas accounts, and requested receipts so that he could show the owners of the money, who lived in Colombia, proof that he had wired the cash and not stolen it. Miranda specifically complained that they had "lost two money pick-ups in New York" due to the delay.

Mauricio places great stock in the next verbal exchange, in which Mauricio asked Miranda whether the money was "for anything illegal." Miranda responded that "this is just money." Mauricio claims that his reliance on Oliva's "word" during this conversation was enough to dispel any notion he might have had that the money came from illegal activity. He fails to acknowledge that a suspected

16

drug trafficker would hardly admit to illegality when being questioned about it.

Moreover, three transactions subsequent to that conversation should have led

Mauricio to inquire why the amounts were getting larger and why "Casamayor"

did not match with his purported social security number. Given the evidence as a

whole, the jury could have found Mauricio's reliance on Oliva's assurances during

this single conversation unreasonable and disingenuous.

In addition, Mauricio remarked that he had heard Miranda "talking about

tobacco," that it was illegal to import tobacco from Cuba, and that such activity

would likely trigger an investigation.[4] Miranda had never mentioned tobacco to

_____

[4]The conversation went as follows:

Mauricio: Listen, I wanted to ask you...
Miranda: Yeah, bro.
Mauricio: ...There's nothing illegal on this? Uh...I'm referring to from where we're wiring the money, it isn't for anything illegal?
Miranda: No, no, no, no, no, the banks are (unintelligible).
Mauricio: Really? In other words, I mean the purpose of these wires is not to buy anything illegal? I'm talking about...
Miranda: No, no, no, no, this is only the money.
Mauricio: Oh, all right.
Miranda: This is just money.
Mauricio: I'm just asking you that (unintelligible).
Miranda: No, relax. That, that's money.
Mauricio: Yes.
Mauricio: In other words, since I've heard that you're talking about tobacco and I heard news that it is illegal to bring tobacco from Cuba, or Cohibas, or (unintelligible), in case they would want to start with an investigation later on.
Miranda: No.
Mauricio: No? Nothing to do with it.
Miranda: No.
Mauricio: Okay, all right.

Mauricio. The jury could have easily inferred that this knowledge, in addition to other information regarding the agents' transactions, was communicated among the Puches.

Moreover, Mauricio never asked the agents why such large sums of cash were in such small bills. He never questioned why the agents used GEC rather than a bank to wire these large amounts of cash when the latter's charge of a flat fee for each transfer would be less costly than GEC's three percent cut. Again, he never inquired into the identities of the agents, even after receipt of the letter from the IRS regarding "Leonardo." The evidence shows that Mauricio knew about "Leonardo" as he expressed some reservation over mention of "tobacco" with regard to "Leonardo"'s business, despite the fact that Oliva previously had never mentioned tobacco to Mauricio.

### 4. Enrique Puche

The agents met with Enrique on July 7 and September 8, with Orlando present on both occasions. Enrique helped count more than $220,000 in cash brought in by the agents on those occasions. But it is not this "mere existence of

---

Miranda: (unintelligible).
Mauricio: I'm just asking you, I trust you...
Miranda: No, no. (unintelligible)
Mauricio: I'll trust you on that, that's it. Relax.
Miranda: Okay.

currency" that incriminates Enrique. United States v. $506,231 in United States Currency, 125 F.3d 442, 452 (7th Cir. 1997). During the September 8 meeting, Oliva joked with Orlando and Enrique about a news story that involved the discovery by law enforcement agents in Colombia of a submarine being outfitted to smuggle cocaine into the United States. Oliva remarked that he needed one of those submarines, and Enrique responded that a submarine could probably hold eighteen tons of cocaine. Shortly thereafter during the same visit, Oliva sought to engage Enrique in a conversation about conducting future wire transfers. Enrique referred the agents to Orlando and told them that "he [Orlando] takes care of that."

Again, the jury could reasonably conclude that Enrique and his co-defendants knew and believed that the agents' money came from narcotics sales, or in the alternative, deliberately closed their eyes and ears to what they had every reason to believe was the reality. Just like Mauricio, Enrique never questioned the agents' need to move increasingly large amounts of cash in small bills outside the United States, the agents' identities despite Oliva's entreaties to use different names for multiple transactions, the letter from the IRS, and the agents' need to move money through GEC rather than through a bank. The jury could reasonably find that Enrique, despite having been present at just two of the agents' visits, learned of the agents' behavior and business on the other nine occasions (as well as

19

the agents' contact with Serna-Osorio and Rojas) through the GEC's board meetings and his familial relationships with Orlando and Mauricio. Though Enrique attempts to dismiss the "submarine" conversation as part of a joke, the jury could have concluded that Enrique's remark, however in jest it may have been, was based on knowledge of "Casamayor"'s drug trafficking.

### B. Jury Instructions

We apply a deferential standard of review to a trial court's jury instructions. See McCormick v. Aderholt, 293 F.3d 1254, 1260 (11th Cir. 2002). Under this standard, we will only reverse "'if we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations.'" Id. (quoting Roberts & Schaefer Co. v. Hardaway Co., 152 F.3d 1283, 1295 (11th Cir. 1998)). In addition, the jury charge must be "considered as a whole." Starke, 62 F.3d at 1381 (internal citations and quotation marks omitted).

First, defendants contend that the district court erred in instructing the jury as to the elements of the offense. Specifically, they claim that the district court omitted the requirement that the undercover agents must have represented the cash to be proceeds of a specified unlawful activity. Further, defendants argue that the court instead erred by framing the requirement in terms of whether defendants "believed" the funds came from specified unlawful activity.

20

Defendants, however, did not object to the district court's charge, thereby limiting review of the issue to plain error. Defendants "must show that there is (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Hall, 312 F.3d 1250, 1259 (11th Cir. 2002) (internal citations and quotation marks omitted). If all three conditions are met, we must then find whether the error seriously affects the "fairness, integrity, or public reputation of judicial proceedings." Id. (internal citations and quotations marks omitted).

Defendants argue that the alleged error affected their substantial rights because the representation element was hotly contested at trial. They contend that the evidence did not "overwhelmingly" establish guilt and, instead, that no rational jury could have found the representation element beyond a reasonable doubt because the agents expressly represented that the source of the funds was legal.

We do not reach the "substantial rights" inquiry because the charge as a whole conveyed to the jury the necessity of finding that the agents had represented to defendants that the funds to be wired were drug money. "So long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions." Palmer v. Bd. of Regents, 208 F.3d 969, 973 (11th Cir. 2000). Though the court did not list representation as a separate, enumerated element, it did accurately quote § 1956(a)(3).

21

Immediately after listing the three elements, the court instructed the jury that "'represented' means any representation made by a law enforcement officer or by another person at the direction of or with the approval of a federal official authorized to investigate or prosecute violations of the money laundering statutes." Again, taken in its entirety, the jury charge was sufficient and did not mislead the jury as to the government's burden. Thus, the instruction does not amount to plain error.

Defendants also challenge the district court's inclusion of an instruction on deliberate ignorance.[5] The court instructed the jury that if the government proved beyond a reasonable doubt that defendants "deliberately and consciously tried to avoid learning that it was in order to be able to say, if apprehended, that [they] did not know the currency was from the specified unlawful activity," the jury would be allowed to treat such deliberate ignorance as having satisfied the knowledge mens rea requirement of the crime.[6]

---

[5]When defendants objected to this instruction at trial, they argued that the government advanced an actual knowledge and not a deliberate ignorance theory. To the extent that they make a different argument on appeal--that a deliberate ignorance instruction was inappropriate because Mauricio asked the agent if the money was legal--we review for plain error. Starke, 62 F.3d at 1380-81.

[6]In total, the relevant instruction read:

When knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if the defendant is aware of a high probability of its existence, unless the defendant actually believes that it does not exist.

22

An instruction on deliberate ignorance is appropriate only if it is shown that the defendant was aware of a high probability of the fact in question and that the defendant "'purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.'" United States v. Rivera, 944 F.2d 1563, 1571 (11th Cir. 1991) (quoting United States v. Alvarado, 838 F.2d 311, 314 (9th Cir. 1987))..

Defendants argue that the instruction constituted plain error because the government presented no evidence that the Puches deliberately avoided making further inquiries of the agents. In particular, they point out that Mauricio asked Agent Miranda about the source of the money. As set forth in detail supra,

---

So, with respect to the issue of the defendants' knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the defendant under consideration believed that the currency provided by the undercover agents constituted proceeds of the specified unlawful activity, that is, narcotics trafficking, and that said defendant deliberately and consciously tried to avoid learning that it was in order to be able to say, if apprehended, that he did not know the currency was from the specified unlawful activity, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.

In other words, you may find that the defendant under consideration acted "knowingly" if you find beyond a reasonable doubt either: (1) that said defendant actually believed that the currency was from the specified unlawful activity; or (2) that said defendant deliberately closed his eyes to what he had every reason to believe was the fact.

I must emphasize, however, that the requisite proof of knowledge on the part of any defendant cannot be established by merely demonstrating that said defendant was negligent, careless, or foolish.

23

however, the government presented ample evidence that defendants should have been aware that the source of the agent's funds was drug sales.

To the extent defendants denied hearing any references to illegal activity or drug sales, a jury could have found that the failure to inquire further by Orlando and Enrique, as well as Orlando's affirmative suggestion to Detective Oliva not to discuss his business with Wilder Moreno, amounted to deliberate ignorance. See Rivera, 944 F.2d at 1570 ("[I]f a party has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge."). Though Mauricio inquired about the source of the cash, his reliance on the agent's "word" is itself flimsy, given the ever increasing amounts of cash being transferred and various communications heavily suggesting illicit activity, and could be found by a jury to amount to deliberate ignorance.

Third, defendants contend that the district court erred in refusing to give a theory of defense instruction that would have required the jury to acquit upon a finding that defendants specifically inquired of the agents whether the money in question was from illicit activity and that the agents responded in the negative.[7]

_____

[7]Defendants' proposed jury instruction, in pertinent part, read:

It is the Defendants' theory of defense that they are not guilty of the crime charged because

24

Defendants are entitled to such an instruction as long as there is any foundation in the evidence to support it. United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995) (citation omitted).

We review a district court's refusal to give a proposed jury instruction for an abuse of discretion. United States v. Futrell, 209 F.3d 1286, 1288 (11th Cir. 2000). "[A] district court's refusal to give the requested instruction is reversible error only if (1) the instruction is substantially correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense." United States v. De La Mata, 266 F.3d 1275, 1298 (11th Cir. 2001).

Defendants detail that the agents made affirmative representations of the legality of the funds, despite subsequent innuendos that they were drug traffickers and the money came from narcotics sales; as such, they claim that "indirect innuendo cannot trump the express representations that the funds are legal." The government responds that reliance on such representations must be objectively reasonable and that the circumstances surrounding the agents' representations

---

he/they specifically inquired of the government agents whether the money he/they were transferring or exchanging was from illegal activity, and that the agents advised him/them that there was nothing illegal about what they were doing.

25

would have led a reasonable person not to rely on the agents' word. See United States v. Funches, 135 F.3d 1405, 1408 (11th Cir. 1998).

Courts have not required agents conducting sting operations to make express representations concerning the illegality of funds, largely because "real criminals" ostensibly would not do so. See Starke, 62 F.3d at 1382. Granting defendants' proposed theory of defense instruction would have effectively acquitted defendants on the basis of any inquiry they may have made regarding the legality of the funds, even amidst the several red flags tipping them off that the source of the funds was in fact illicit. Even defendants concede that their proposed instruction stated a "novel proposition." Accordingly, we decline their invitation to make it the law and hold that the district court did not abuse its discretion in denying the requested instruction.

## C. Evidentiary Issues

We will not reverse a trial judge's determinations of the admissibility of evidence unless we find an abuse of discretion. See Miles, 290 F.3d at 1351.

First, defendants challenge the government's use of testimony by two government witnesses, Juan Fernandez Gomez and Ivan Castano, who, before the principal DEA investigation giving rise to these indictments, had made an agreement with these same defendants to transfer millions of dollars in drug

proceeds.  According to Gomez and Castano, the cash was drug proceeds that needed to be wired to Colombia.  Gloria Puche, Enrique's wife, agreed to accept their business and in turn, GEC processed millions of dollars in cash for Gomez in 1995 and 1996.  The district court ruled that the testimony fell under Federal Rule of Evidence 404(b)[8] and instructed the jury that the testimony was to be admitted for the limited purpose of showing defendants' intent and to dispel the notion that  defendants' laundering was the result of ignorance, mistake, or accident.

Because defendants never objected to the testimony at trial, we review its admission for plain error.  See United States v. Khoury, 901 F.2d 948, 966 (11th Cir. 1990).  Under this standard, "we correct only for errors that are particularly egregious and that seriously affect the fairness, integrity, or public reputation of judicial proceedings, and then only when a miscarriage of justice would result."

---

[8] Rule 404(b) provides:

Other Crimes, Wrongs, or Acts.--Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

27

<u>United States v. Jernigan</u>, 341 F.3d 1273, 1280 (11th Cir. 2003) (internal citations and quotation marks omitted). Because the charged offenses and the "uncharged offenses" that were the subject of the 404(b) testimony were quite similar and the latter tends to undermine the possibility that Defendants did not know or were not suspicious about the "illegal" source of the proceeds, we decline to disturb the district court's ruling. Our case is similar to <u>United States v. Lokey</u>, 945 F.2d 825 (5th Cir. 1991), where the indictment alleged that the defendants conspired to distribute marijuana from February 1987 to May 1989. The Fifth Circuit affirmed the district court's admission of testimony regarding drug transactions before February 1987 as probative of "how the conspiracy came about, how it was structured, and how each appellant became a member." <u>Id</u>. at 834. Gomez and Castano's testimony is probative and helpful in the same vein.

Defendants also challenge the court's decision to permit Detective LuAnn Smith's testimony on the deposit patterns of GEC's sub-agents and their "structuring" of these deposits in amounts less that $10,000 to avoid the filing of currency transaction reports, on the grounds that the indictment had not charged such structuring as an object of the conspiracy and that Smith was not qualified as an expert on the matter.The district court did not abuse its discretion in admitting Detective Smith's testimony. The court allowed Smith's testimony as probative of

28

defendants' intent and knowledge of the conspiracy and the nature of the money that they were wiring out of the country. As for Smith's qualifications as an expert, the court was satisfied with her testimony on having approximately 250 hours of formal and informal training in the area of domestic and international money laundering. Defendants' argument that Smith's testimony was not based on first-hand observations and knowledge is irrelevant for purposes of the subject matter of her testimony. She had adequately reviewed GEC's records and discerned a regular pattern of deposits of less than $10,000. As the district court determined, Smith was qualified to review the records and to ascertain that GEC had "structured" their bank deposits to avoid reporting requirements.

Defendants' third evidentiary challenge focuses on undercover Agent Oliva's testimony that the word "traqueteo" is a Spanish term for drug dealing and that "when you say traqueteo, everyone understands that." Tapes of the conversations between Oliva and Orlando Puche reveal that Oliva told Orlando that the funds came from his "traqueteo." On cross-examination, Oliva admitted that he had not checked every definition of "traqueteo" in the Spanish dictionary so that he did not definitely know whether the word bore any other meaning or connotation. However, he continued to maintain that in Miami and Colombia, "traqueteo" meant "drug dealing." Defendants objected that Oliva was never

29

qualified as an "expert" under Federal Rule of Evidence 702 and that in the alternative, his testimony as to what "everyone" understands about the term amounted to impermissible lay opinion testimony under Rule 701.

Assuming without deciding that the admission of Oliva's testimony was error, it is not reversible. DEA translator Nanette Orloff also testified at trial that "traqueteo" was a Spanish slang term for drug dealing. Under these circumstances, defendants have not shown a reasonable likelihood that any error substantially influenced the outcome or that there was insufficient evidence unaffected by error to support the verdict. Hence, reversal on this ground is not warranted.

### D. Juror Replacement

Under Federal Rule of Criminal Procedure 24, the district court has discretion to replace with alternates "any jurors who are unable to perform or who are disqualified from performing their duties." Fed. R. Crim. P. 24(c). See United States v. Smith, 918 F.2d 1501, 1512 (11th Cir. 1990). We review the exercise of this discretion "to ensure that the District Court did not discharge the juror without factual support, or for a legally irrelevant reason" so as to amount to a showing of bias or prejudice to the defendant. Id. "Where the juror's disability is 'less certain or obvious, however, some hearing or inquiry...is appropriate to the

proper exercise of judicial discretion.'" United States v. Fajardo, 787 F.2d 1523, 1525 (11th Cir. 1986) (citation omitted).

This issue follows from the district court's replacement of one juror (Lau) who had complained that she was sick with severe cramps and had scheduled a doctor's appointment. The court interviewed Lau in chambers and concluded that she was unable to "hang on for the rest of the afternoon." The court then notified the parties of Lau's situation, her excusal from further jury service, and her replacement by an alternate juror. Defendants challenge the replacement on grounds that the court failed to contact counsel so that defendants could have been present during the juror's interview, that the court failed to have the interview recorded, and that the court's inquiry into Lau's situation was deficient.

In the court's opinion, the juror was too ill to continue. This is not legally irrelevant, nor does it appear to be without any factual support. Hence, defendants have not shown bias or prejudice. This Court has affirmed juror excusals in far less obvious situations, such as in Fajardo, where the juror in question was well enough to continue but excused over defense counsel's objections after further inquiry because his sinus problems were a distraction to the proceedings. See 787 F.2d at 1525. Defendants rely on United States v. Spence, 163 F.3d 1280 (11th Cir. 1998), where this Court reversed a conviction

31

because of the district court's insufficient inquiry before excusing a juror. In Spence, the district court excused a juror after deliberations had already begun and then continued with only eleven jurors. See id. at 1282-84. Here, the court dismissed the juror before the commencement of jury deliberations. Moreover, defendants only speculate as to whether the replaced juror may have been more favorably disposed to them than the alternate, and hence have not shown a "reasonable possibility that the District Court's violation of Rule 24(c) actually prejudiced the [defendants] by tainting the jury's final verdict." United States v. Brewer, 199 F.3d 1283, 1286-87 (11th Cir. 2000). We conclude that the district court did not abuse its discretion in excusing juror Lau.

### E. Forfeiture Order

Defendants argue that the district court's forfeiture order was erroneous because it included $1,606,318.60 in legitimate funds that shared bank accounts with the undercover DEA money and that the order was excessive in violation of the Eighth Amendment. We disagree and affirm the district court's order.

We review de novo the district court's legal conclusions regarding forfeiture and the court's findings of fact for clear error. See United States v. Kennedy, 201 F.3d 1324, 1329 (11th Cir. 2000). Whether a forfeiture order is

constitutionally excessive under the Eighth Amendment calls for <u>de novo</u> review as well. See <u>United States v. Bajakajian</u>, 524 U.S. 321, 336 n.10 (1998).

In pertinent part, 18 U.S.C. § 982(a)(1) reads that a court, "in imposing sentence on a person convicted of an offense in violation of. . . section 1956 . . ., shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." Defendants concede that the commissions paid to them by the agents, totaling $22,375.00, were traceable to the offense and thus are subject to forfeiture. The district court found that the legitimate funds in GEC's bank accounts facilitated the transfer of the illegal funds by providing "cover" for them. Defendants assert that the government did not prove any intent by defendants to commingle the funds for the purpose of facilitating the transfer of the DEA money.

"Property" under the statute includes "the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." <u>United States v. Bornfield</u>, 145 F.3d 1123, 1135 (10th Cir. 1998) (internal citation and quotation marks omitted). "Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance....[T]he mere pooling or commingling of tainted and untainted funds in an account does not,

33

without more, render the entire contents of the account subject to forfeiture." Id. (internal citation and quotation marks omitted). Forfeiture of commingled funds, however, is proper when the government demonstrates that the defendant pooled the funds to facilitate or "disguise" his illegal scheme. Id.

GEC's accounts were not a mere pooling of funds, but were an arrangement through which tainted funds could be transferred overseas. This view comports with the Fifth Circuit's explanation in United States v. Tencer, 107 F.3d 1120 (5th Cir. 1997) that

> [l]imiting the forfeiture of funds under these circumstances to the proceeds of the initial fraudulent activity would effectively undermine the purpose of the forfeiture statute. Criminal activity such as money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme. It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue."

Id. at 1135 (internal citations and quotation marks omitted). Faced with the evidence that the funds, both legitimate and illegitimate, were rapidly moved into bank accounts in order to conceal the nature and source of the narcotics proceeds, the jury could have inferred that the legitimate proceeds facilitated the illegal proceeds by acting as a "cover" and hence reduced suspicion of the latter's source.

34

Secondly, the forfeiture order was not grossly disproportionate to the gravity of defendants' offenses. See United States v. One Parcel of Real Estate at 10380 S.W. 28th Street, Miami, FL, 214 F.3d 1291, 1295 (11th Cir. 2000). Pursuant to the forfeiture statute, defendants were liable for a civil penalty in the amount of the value of the property, funds, or monetary instruments involved in the transactions. A jury found that defendants conspired to launder approximately $6.7 million dollars, including over $700,000 actually laundered and six million dollars more that was agreed to be laundered in the future. The court reduced the original forfeiture judgment of $8,343,193.60 because the "hypothetical" laundering, while agreed to, never occurred. The remaining amount consisted of GEC's commissions and the commingled funds.

Defendants' reliance on United States v. Bajakajian, 524 U.S. 321 (1998), is misplaced, as the defendant in that case was not a money launderer and was convicted only for a reporting offense. The Supreme Court found that for such a defendant, the forfeiture of the entire amount of $357,144 carried overseas was grossly disproportionate to the offense, which was a failure to report that he was transporting more than $10,000 outside the United States. Id. at 337. In this case, defendants were convicted of conspiracy to promote and conceal a money laundering scheme, in addition to a failure to adhere to reporting requirements.

35

Accordingly, we find the district court's forfeiture order to be within constitutional bounds.

## F. Sentencing

We review the district court's factual findings at sentencing for clear error and the court's application of the United States Sentencing Guidelines (U.S.S.G.) de novo. See United States v. Torrealba, 339 F.3d 1238, 1242 (11th Cir. 2003).

Defendants contend that the district court erred in using the base offense level for "promotion" money laundering under U.S.S.G. § 2S1.1(a)(1), determining the amount of funds laundered under U.S.S.G. § 2S1.1(b)(2) (amended 2001), and failing to apply the three-level conspiracy exception in U.S.S.G. § 2X1.1(b)(2).

On the first ground, defendants argue that the district court erred at sentencing by using the base offense level for "promotion" money laundering under U.S.S.G. § 2S1.1(a)(1). A conviction for "promotion" of money laundering under § 1956(a)(3)(A) yields a base offense level of 23, while a conviction for "concealment" of money laundering under § 1956(a)(3)(B) yields a base offense level of 20. U.S.S.G. §§ 2S1.1(a)(1)-(2). Because the jury found by special verdict that all three defendants conspired to commit both "promotion" and "concealment" money laundering, the district court applied the higher base

offense level of 23. Defendants objected, arguing that the government had failed to prove beyond a reasonable doubt that they intended to promote narcotics trafficking. On appeal, they argue that if we conclude that the evidence produced is insufficient to support their convictions for conspiracy to commit "promotion" money laundering, but sufficient to support their convictions for conspiracy to commit "concealment" money laundering, the district court clearly erred by using the base offense level for "promotion."

As held above, we find the evidence sufficient to support defendants' convictions for both "promotion" and "concealment" under § 1956(a)(3). The district court did not err in applying the base offense level of 23 to determine defendants' sentences.

Secondly, defendants claim that they were held responsible for $524,000 in funds that were transacted before they arguably joined the conspiracy and six million dollars in hypothetical future transactions that fell outside their agreement or intent to conspire. The district court increased defendants' base offense levels by eight levels under U.S.S.G. § 2S1.1(b)(2)(I) (amended 2001) because the amount laundered exceeded six million dollars.

Defendants argue that because September 8, 2000, was the earliest date that they could have possibly joined the conspiracy, all of the funds delivered by the

undercover agents to GEC up to that date must be excluded from a determination of their sentences. In the conspiracy context, the value of the funds laundered is determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). However, "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct...." Id. at § 1B1.3, (cmt.) n.2.

The jury found defendants guilty as charged in the indictment of a conspiracy that began on or about May 30, 1999 and lasted until approximately October 30, 2000. Thus, their relevant conduct would include all funds delivered by the agents to GEC during that period. The district court did not err in increasing their base offense levels by eight levels under U.S.S.G. § 2S1.1(b)(2)(I).

Defendants further argue that the government failed to prove by a preponderance of the evidence that they agreed or intended to launder an additional six million dollars in the future. Again, defendants overlook the fact that the jury found, by special verdict, that part of the offense was their agreement to launder six million dollars in the future. The district court properly concluded that amount to be part of defendants' relevant conduct.

38

Finally, defendants argue that U.S.S.G. § 2X1.1(b)(2) mandates a three-level reduction in sentencing because they had not completed or were not close to completing all the acts they believed necessary for the completion of the money laundering scheme, especially with regard to the six million dollars in future transactions. Because we find that this Court's decision in United States v. Khawaja, 118 F.3d 1454 (11th Cir. 1997), controls, we hold that the district court was required to reduce the offense level for all three individual defendants by three levels under U.S.S.G. § 2X1.1(b)(2).

Khajawa involved a money-laundering conspiracy where the two defendants planned to launder two million dollars, but managed to launder only $570,556 before arrest. We found that at the time the government had concluded its sting operation, the defendants had not yet arranged for specific transactions to occur in the future. They had not "taken crucial steps (including for example, preparing falsified documentation, securing cashier's checks, or arranging meetings for the exchange) to launder the remaining balance of $2 million." Id. at 1458. As a result, the defendants "neither believed that they had completed all the acts necessary on their part nor were they about to complete all such acts for the laundering" of the entire planned amount." Id. We held, therefore, that they were entitled to the three-level reduction under U.S.S.G. § 2X1.1(b)(2). Id.

In this case, defendants actually laundered $714,500. The jury found that an additional six million dollars was agreed to be laundered in the future. On September 8, Agent Oliva told Orlando that he would need to transfer $400,000 to $600,000 a week until December. Orlando advised Oliva to let him know beforehand exactly how much cash he would be bringing, and recommended that he deliver the money on either Mondays and Thursdays or Mondays and Wednesdays--he expressed a fear of making transfers too close together. Shortly thereafter, Orlando notified Oliva that he wanted to hold off on transfers. In response to Oliva's next inquiry on whether GEC could make a transfer, Orlando informed Oliva that he was about to have two GEC bank accounts closed due to excessive movement. Orlando assured Oliva that although he could not make transfers with Oliva presently, he would contact him as soon as practicable.

Under these circumstances, none of the defendants had taken crucial steps, such as contacting the agents or preparing paperwork for more transfers, to launder the remaining six million dollars. Consequently, as in Khajawa, defendants "neither believed that they had completed all acts necessary on their part nor were they about to complete all such acts for the laundering" of the entire amount agreed upon. Id. The government does not address this argument, nor does it attempt to distinguish Khawaja.

40

In addition, we must determine whether the offense level for defendants' sentences would be higher for their agreement to launder $6.7 million minus three levels under U.S.S.G. § 2X1.1(b)(2), or for their actually laundering $714,500 without any corresponding reduction. Comment 4 and Khajawa hold:

> In certain cases, the participants may have completed (or have been about to complete but for apprehension or interruption) all of the acts necessary for the successful completion of part, but not all, of the intended offense. In such cases, the offense level for the count (or group of closely-related counts) is whichever of the following is greater: the offense level for the intended offense minus 3 levels (under s 2X1.1(b)(1), (b)(2), or (b)(3)(A)), or the offense level for the part of the offense for which the necessary acts were completed (or about to be completed but for apprehension or interruption). For example, where the intended offense was the theft of $800,000 but the participants completed (or were about to complete) only the acts necessary to steal $30,000, the offense level is the offense level for the theft of $800,000 minus 3 levels, or the offense level for the theft of $30,000, whichever is greater.

U.S.S.G. § 2X1.1, (cmt.) n.4; Khajawa, 118 F.3d at 1458-59.

The intended laundering of $6.7 million requires an eight-level increase under § 2S1.1(b)(2)(I). This offense level, however, must be reduced by three levels because defendants had not completed or were not close to completing all the acts they believed necessary to laundering the six million dollars in future transactions. Thus, the application of U.S.S.G. § 2X1.1(b)(2) results in a

five-level increase. In contrast, the actual laundering of $714,500 would have resulted in a four-level increase under § 2S1.1(b)(2)(E). Hence, the five-level increase under § 2X1.1(b)(2), the greater of the two offense levels, becomes the operative offense level for defendants. As a proper application of the Sentencing Guidelines would result in a lower offense level for defendants (five levels as opposed to eight levels), we find that the district court's failure to apply § 2X1.1 was clear error. Thus, we vacate defendants' sentences and remand for sentencing consistent with this opinion.

For the foregoing reasons, we **AFFIRM** the convictions of all defendants but **VACATE** their sentences and **REMAND** for the limited purpose of applying the three-level reduction under U.S.S.G. § 2X1.1(b)(2) and then resentencing within the resulting U.S.S.G. range.