[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 16, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-15318

_____

D. C. Docket No. 05-00014-CR-HL-7

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALMA WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(May 16, 2008)**

Before TJOFLAT, HULL and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Alma Williams ("Williams") appeals her convictions for five counts of wire

fraud and one count of theft concerning programs receiving federal funds

[hereinafter "federal funds theft"], in violation of 18 U.S.C. §§ 1343 and 666, and the resulting 33-month sentence imposed by the district court. On appeal, Williams argues that her convictions violate the Double Jeopardy Clause. Williams also argues that the evidence at trial was insufficient to support a conviction, and that the district court constructively amended the indictment, improperly admitted evidence, and improperly applied three sentencing adjustments. For the following reasons, we affirm Williams's convictions, but vacate her sentence and remand this case back to the district court for resentencing consistent with this opinion.

## I. BACKGROUND

Williams was the Executive Director and Chief Financial Director of Eastside Training Academy ("ETA") in Valdosta, Georgia. ETA, a non-profit organization incorporated in the State of Georgia, primarily provides pre-kindergarten child care and infant daycare. Williams's husband, Bunnis Williams, was the Chief Executive Officer and President of the Board of Directors of ETA.

In late 2000, Williams agreed to manage two federal programs, the Foster Grandparent Program and the Retired Senior Volunteer Program, under ETA's sponsorship. To that end, Williams applied for and received federal grants from the Corporation for National and Community Service ("CNCS"). CNCS is an

independent federal agency that administers and dispenses federal grant funds to support local programs fostering volunteer and community service activities. CNCS granted funds to ETA for the limited purpose of organizing senior volunteers to engage in community service in schools, hospitals and museums.

During 2001, CNCS wired approximately $320,000 in federal grants to ETA's account for its management of the Foster Grandparent Program and the Retired Senior Volunteer Program. ETA's use of the grant funds was limited to the direct costs of managing these programs, including mileage reimbursements and small stipends to low-income senior volunteers, and salaries for a full-time project director, full-time coordinators, and a part-time bookkeeper. CNCS also authorized ETA to spend grant funds on certain administrative overhead costs that CNCS had pre-approved and built into the budgets for each program. Grant rules prohibited service providers such as ETA from using grant funds to pay for administrative overhead or indirect costs not pre-authorized by CNCS through a separate line-item budget.

As we describe in further detail later in this opinion, ETA spent federal grant money on unauthorized items such as Williams's salary, checks made payable to Bunnis Williams, general ETA operating expenses, rent and utilities for facilities not being used by the federal grant programs, and plumbing work for one of

3

Williams's separate rental properties. Despite CNCS restrictions, ETA spent approximately one-third, or $101,000, of grant funds on unauthorized expenditures.

A federal grand jury charged Williams and her husband with seven counts of wire fraud, one count of federal funds theft, and aiding and abetting each other thereto, pursuant to 18 U.S.C. §§ 1343, 666, and 2. At trial, the government showed that Williams had primary authority over ETA finances and that she had direct control over the bookkeepers who managed the federal grant funds. The evidence showed how the bookkeepers, following Williams's orders, charged unapproved, personal expenditures to the federal grant programs using a percentage-based formula that Williams devised. In support of her good faith defense, Williams testified that she was unaware that her use of the grant funds was improper and that she did not intend to defraud the government. The jury convicted Williams on five counts of wire fraud and on the federal funds theft count, but it acquitted Bunnis Williams of all charges.

To determine Williams's advisory guideline sentence, the district court applied four upward adjustments to Williams's base offense level: (1) a two-level aggravating role adjustment; (2) a two-level abuse of trust adjustment; (3) a two-level obstruction of justice adjustment; and (4) an eight-level adjustment for the

4

amount of loss. After applying these adjustments, the district court sentenced Williams to thirty-three months imprisonment, the bottom of the applicable guidelines range.

## II. DISCUSSION

A. *Double Jeopardy*

Williams first contends that her separate convictions for wire fraud and federal funds theft violate the Double Jeopardy Clause of the Fifth Amendment because the factual basis of her theft conviction is "part and parcel"of the scheme to defraud underlying her conviction for wire fraud. She also asserts that her convictions on multiple counts of wire fraud constitute double jeopardy.

We review claims of constitutional error *de novo*. *United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir. 2004). Where a defendant fails to assert a double jeopardy claim before the district court, however, she has forfeited that claim. *United States v. Lewis*, 492 F.3d 1219, 1222 (11th Cir. 2007) (en banc). We nonetheless review such forfeited claims under the plain error standard of Federal Rule of Criminal Procedure 52(b). *Lewis*, 492 F.3d at 1222. As the Supreme Court explained in *United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993), the defendant's "[m]ere forfeiture, as opposed to waiver, does not extinguish an 'error' under Rule 52(b)." *Id.* at 733, 113 S. Ct. at 1777.

5

Williams did not raise her double jeopardy arguments to the district court. Although she failed to raise the claims, Williams made no affirmative steps to voluntarily waive them. *See Lewis*, 492 F.3d at 1221–22 (finding that defendant did not waive, but rather forfeited, double jeopardy claim when raising it for the first time on appeal). Consequently, Williams's failure to raise these claims did not result in her intentional relinquishment of a known right, and we review these forfeited claims for plain error.

As a threshold matter, "[w]e will correct a plain error when (1) an error has occurred, (2) the error was plain, and (3) the error affected substantial rights." *Lewis*, 492 F.3d at 1222. "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if . . . the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631–32, 122 S. Ct. 1781, 1785, 152 L. Ed. 2d 860 (2002) (internal quotation marks omitted) (quoting *Johnson v. United States*, 520 U.S. 461, 467, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718 (1997)); *Lewis*, 492 F.3d at 1222.

We analyze issues of double jeopardy under the test set forth by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). *United States v. Hassoun*, 476 F.3d 1181, 1185 (11th Cir. 2007). Under

6

*Blockburger*, when a single, completed criminal transaction violates two or more criminal statutes, the Double Jeopardy Clause does not shield a defendant against prosecution under one or more of the applicable statutes so long as "each statute requires proof of an additional fact which the other does not . . . ." *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182. The *Blockburger* test is one of statutory interpretation in which we examine the elements of each offense to determine whether Congress intended to authorize cumulative punishments. *Albernaz v. United States*, 450 U.S. 333, 337, 101 S. Ct. 1137, 1141, 67 L. Ed. 2d 275 (1981); *Hassoun*, 476 F.3d at 1185.

1. Convictions for Wire Fraud and Federal Funds Theft

Under 18 U.S.C. § 1343, wire fraud requires proof beyond a reasonable doubt that (1) the defendant participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud.[1] Under 18 U.S.C. § 666, federal funds theft requires proof beyond a reasonable

---

[1] 18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

doubt that (1) the defendant was an agent of an organization; (2) the organization receives more than $10,000 from a federal grant program in one year; (3) the defendant embezzled, stole, obtained by fraud, or otherwise without authority knowingly converted or intentionally misapplied property valued at $5,000 or more that was under the organization's care, custody, or control.[2]

The elemental analyses of §§ 1343 and 666 demonstrate that Williams's convictions for wire fraud and federal funds theft satisfy the *Blockburger* test. Wire fraud requires neither proof of the defendant's agency relationship to an organization receiving federal funds, nor proof of theft. Federal funds theft requires no proof of the use of interstate wire transmissions during a purported scheme or artifice to defraud. Contrary to the contention implicit in Williams's argument, the use of wires in interstate commerce is a substantive, albeit

---

[2] 18 U.S.C. § 666 provides, in relevant part:
    Whoever, if the circumstance described in subsection (b) of this section exists—
    (a)(1) being an agent of an organization . . . embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that . . . is valued at $5,000 or more, and . . . is owned by, or is under the care, custody, or control of such organization, government, or agency[] . . . shall be fined under this title, imprisoned not more than 10 years, or both.
    (b) The circumstance referred to in subsection (a) . . . is that the organization . . . receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant[] . . . .

jurisdictional, element that the government must prove beyond a reasonable doubt. Because §§ 1343 and 666 each requires proof of an element not required by the other, Williams's convictions for both crimes satisfy the *Blockburger* test.

### 2. Convictions for Multiple Counts of Wire Fraud

Likewise, we find no error in Williams's convictions on multiple counts of wire fraud because each count satisfies the *Blockburger* test. Williams argues that the indictment was multiplicitous because it alleged only one scheme to defraud, which the government manipulated into separate counts with each wire of grant funds into ETA's account. Williams's argument fails because it rests on a fundamental misinterpretation of the wire fraud statute.

An indictment is multiplicitious if it charges a single offense in more than one count. *Ward v. United States*, 694 F.2d 654, 660–61 (11th Cir. 1983) (quoting *United States v. De la Torre*, 634 F.2d 792, 794 (5th Cir. 1981)). A multiplicitious indictment not only subjects the defendant to numerous sentences for one offense, but also "prejudice[s] the defendant and confuse[s] the jury by suggesting that not one but several crimes have been committed." *United States v. Hearod*, 499 F.2d 1003, 1005 (5th Cir. 1974) (per curiam).[3] A multiplicitous indictment therefore

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

violates the principles of double jeopardy because it gives the jury numerous opportunities to convict the defendant for the same offense. We use the *Blockburger* test to determine whether an indictment is multiplicitious, verifying that each count requires an element of proof that the other counts do not require. *Ward*, 694 F.2d at 661.

Wire fraud requires proof of a scheme or artifice to defraud and the use of interstate wire transmissions in furtherance of the scheme. 18 U.S.C. § 1343. Section 1343 targets not the defendant's creation of a scheme to defraud, but the defendant's *execution* of a scheme to defraud. To that end, it punishes *each* interstate wire transmission that carries out that scheme. *See Sibley v. United States*, 344 F.2d 103, 105 (5th Cir. 1965). Where one scheme or artifice to defraud involves multiple wire transmissions, each wire transmission may form the basis for a separate count. In determining whether each wire transmission is an execution, courts must look to the function of the wire transmission in the context of the defendant's overall scheme and examine how that transmission furthers the scheme.

Moreover, the text of § 1343 plainly states that the defendant need not make a wire transmission herself, but may *cause* such wire transmission *to be made* to further her scheme to defraud. The statute thus prevents defendants from escaping

10

criminal liability merely because another party makes the wire transmission underlying the charge. Consequently, a federal agency's *a priori* decision to disburse grant funds through periodic installments neither bars criminal liability nor constitutes an unfair conversion of one offense into multiple counts.

Precedent under the mail fraud and bank fraud statutes, 18 U.S.C. §§ 1341 and 1344, respectively, supports this conclusion.[4] In *Badders v. United States*, 240 U.S. 391, 36 S. Ct. 367, 60 L. Ed. 706 (1916), the Supreme Court held that so long as each act "ha[d] been found to have been done for the purpose of executing the scheme, . . . . there is no doubt that the law may make each putting of a letter into the postoffice a separate offense." *Id.* at 394, 36 S. Ct. 368. We have applied this interpretation of § 1341, finding that "[e]ach mailing in furtherance of a fraudulent scheme constitutes a separate violation of the mail fraud statute." *United States v. Edmondson*, 818 F.2d 768, 769 (11th Cir. 1987) (per curiam). We have made an analogous interpretation of the bank fraud statute, holding that "[u]nder 18 U.S.C.

_____

[4] See *Carpenter v. United States*, 484 U.S. 19, 25 n.6, 108 S. Ct. 316, 320 n.6, 98 L. Ed. 2d 275 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses . . . ."); *Neder v. United States*, 527 U.S. 1, 20–21, 119 S. Ct. 1827, 1839, 144 L. Ed. 2d 35 (1999) ("The bank fraud statute, which was modeled on the mail and wire fraud statutes, similarly prohibits any 'scheme or artifice to defraud a financial institution . . . .'" (quoting 18 U.S.C. § 1344)); *United States v. Ward*, 486 F.3d 1212, 1221 (11th Cir.) ("Aside from the means by which a fraud is effectuated, the elements of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, are identical."), *cert. denied*, — U.S. — , — S. Ct. — , — L. Ed. 2d — (2007); *United States v. Conner*, 752 F.2d 566, 574 (11th Cir. 1985) ("The wire fraud statute is to be interpreted the same as the mail fraud statute . . . .").

§ 1344, a defendant may be charged in separate counts for each 'execution' of the scheme to defraud." *United States v. Sirang*, 70 F.3d 588, 595 (11th Cir. 1995); *see also United States v. De La Mata*, 266 F.3d 1275, 1287 (11th Cir. 2001) ("The unit of the offense created by § 1344 is each execution or attempted execution of the scheme to defraud . . . ."). In the bank fraud context, we have found that "[r]elevant factors in determining whether there are multiple executions are . . . the number of transactions[] and the number of movements of money." *Sirang*, 70 F.3d at 595. Our sister circuits faced with this issue have reached similar interpretations of 18 U.S.C. §§ 1341, 1343, and 1344. [5]

Here, the indictment charged Williams with devising "a scheme and artifice to defraud and obtain money by means of false and fraudulent pretenses . . . ." R. 1, Doc. 1 at 3–4. It further charged Williams with "executing [this] scheme and artifice to defraud [by] knowingly . . . and willfully caus[ing] [CNCS] and the United States Department of Health and Human Services, to send electronic wire transfers of funds . . . to the business account of Eastside Training Academy." *Id.*

---

[5] *See, e.g.*, *United States v. Abboud*, 438 F.3d. 554, 567 (6th Cir.) (noting that the circuits have consistently held that each check in a check kiting scheme is an execution of bank fraud that may be charged as a separate offense), *cert. denied*, — U.S. — , 127 S. Ct. 446, 166 L. Ed. 2d 309 (2006); *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001) (holding that "each use of the wires constitutes a separate violation of 18 U.S.C. § 1343"); *United States v. Gardner*, 65 F.3d 82, 85 (8th Cir. 1995) ("Under 18 U.S.C. § 1341, it is not the plan or scheme that is punished, but rather each individual use of the mails in furtherance of that scheme.").

at 4–5. The indictment then lists seven separate wire transmissions—made on different dates and in different amounts—of funds from CNCS and the U.S. Department of Health and Human Services, through the U.S. Treasury, into ETA's account. Each resultant wire fraud count requires proof of a separate wire transmission made in furtherance of Williams's scheme to defraud—an element not required by the others. We hold that each wire fraud offense was complete upon each wire disbursement that Williams caused CNCS to make in furtherance of her scheme to defraud. *See Sibley*, 344 F.2d at 105.

Williams points to *United States v. Eaves*, 877 F.2d 943 (11th Cir. 1989), to support her claim that the government manipulated one scheme to defraud into multiple counts of wire fraud by wiring separate payments of one lump sum. *Eaves* involved a prosecution on four counts of extortion under the Hobbs Act, 18 U.S.C. § 1951(a),[6] in which the defendant, a Fulton County public official, made several agreements with an informant and an undercover FBI agent to accept money in exchange for favorable votes on certain zoning plans and government

_____

[6] 18 U.S.C. § 1951(a) provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

contracts. The government had been investigating Eaves for three years before his indictment. We held that two of those counts were multiplicitous because they stemmed from *one agreement* Eaves made to accept $30,000 that the FBI agent, at the government's request, *paid in two installments*. 877 F.2d at 947. Reversing Eaves's conviction on one count, we found that the two counts failed to satisfy the *Blockburger* test, as each count under § 1951 "requires that (1) the defendant induced his victim to part consensually with property (2) either through the wrongful use of actual or threatened force, violence or fear or under color of official right (3) in such a way to adversely affect interstate commerce." *Id.* Although Eaves accepted two payments, we concluded that those payments were "installments of a lump sum" stemming from one act of inducement. *Id.* We cautioned that allowing multiple charges on the basis of those facts "would give the government unfettered discretion to determine how many crimes with which to charge a defendant by manipulating the methods of payment." *Id.*

*Eaves* is inapposite to this case. As we have explained above, § 1343 punishes not the creation of a scheme to defraud, but each execution of that scheme by use of interstate wire transmissions. In this case, ETA, through Williams, submitted two applications for federal grants to CNCS. After CNCS approved ETA's budget applications, the funds were wired into ETA's account on a

14

quarterly schedule during 2001. The wire transfers occurred well before CNCS began its investigation of ETA in 2002, and the record reveals no evidence of the government's manipulation of the wire transfers or bad faith. For these reasons, we find that Williams's indictment for seven counts of wire fraud was not multiplicitous, and that her prosecution and subsequent convictions on five of those counts did not constitute double jeopardy.

B.    *Sufficiency of the Evidence*

Williams next argues that the evidence not only failed to establish her intent to steal or defraud, but also failed to rebut her good faith defense. In support of her defense, Williams testified that her misapplication of grant funds was due to her honest misunderstanding of grant rules and conditions, and that she ordered ETA bookkeepers to modify Quickbook records, in good faith, once she learned of her previous accounting errors. In addition, Williams claims that the prosecution failed to meet its burden of proof because it did not establish any financial loss suffered by the victim of her fraud.

We review de novo challenges to the sufficiency of the evidence in criminal trials, viewing the evidence in the light most favorable to the government. *United States v. Futrell*, 209 F.3d 1286, 1288 (11th Cir. 2000) (per curiam). The Court will resolve any conflicts in favor of the government and accept all reasonable

15

inferences that tend to support the government's case. *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999). We assume that the jury made all credibility choices in support of the verdict. *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006), *cert. denied*, — U.S. — , 127 S. Ct. 2155, 167 L. Ed. 2d 882 (2007). Viewed in this light, the evidence is sufficient to support a conviction if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996). In rebutting the government's evidence "[i]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *Thompson*, 473 F.3d at 1142.

We first examine the government's theory of prosecution in determining the sufficiency of the evidence. *United States v. Ross*, 131 F.3d 970, 980 (11th Cir. 1997). At trial, the government advanced the theory that Williams devised a scheme to defraud in which she knowingly misused federal grant funds for personal expenses and misapplied grant funds to items not approved in the CNCS line-item budget. In furtherance of this scheme, Williams caused CNCS to make scheduled wire transmissions of federal grant funds into ETA's account, over which she exercised final authority for how money was spent.

16

The government presented sufficient evidence, direct and circumstantial, to prove Williams's intent to defraud. During trial, the government showed that under Williams's direction, the ETA issued a $15,000 check payable to the order of P.R. Property Investments, the umbrella name for Williams's private rental properties. The evidence also showed that Williams authorized checks to be used for other unapproved items, such as a personal salary, payments on Bunnis Williams's car note, rent payments on Williams's night club, expenses related to their new home, and construction work on ETA grounds unrelated to the federal programs. Furthermore, the evidence revealed that Williams fired ETA employees after they questioned, and later reported, her mismanagement of ETA's account.

During 2001, CNCS made seven wire transfers disbursing grant funds into ETA's account, totaling $320,081. Although grant rules did not require ETA to maintain the grant funds in a separate account, the rules did mandate that ETA keep detailed records tracking the expenditure of grant money to ensure that grant funds were spent only on approved program costs.[7] As Chief Financial Director,

---

[7] Requiring ETA and other grantees to maintain federal grant funds in a separate account would have been the easiest and clearest way to track federal funds. By allowing commingling of funds, the grant rules placed a burden on grantees to create a method of separating their expenditures of federal funds from other financial responsibilities, such as unapproved administrative overhead costs. This may be difficult where, as here, the grantee is operating other programs in addition to the federal grant programs, and may be doing so in the same building. While Williams is fully responsible for her criminal conduct, we wonder why CNCS permits commingling of funds, which may tempt grantees in these circumstances to risk dipping into the pool of available federal funds.

17

Williams had direct supervisory authority over ETA bookkeepers and required the bookkeepers to allocate costs to the Foster Grandparent Program and Retired Senior Volunteer Program pursuant to a percentage-formula she devised. Rather than ensure that grant funds were used only for approved program expenses, Williams ordered the bookkeepers to use her percentage-formula for all expenditures from ETA's account. For example, ETA bookkeepers used Williams's formula to charge $9,000 of the $15,000 check payable to P.R. Investments to the two federal grant programs. CNCS investigators determined that under Williams's direction, the ETA charged approximately $101,000 in unauthorized expenditures to the federal grant programs during 2001.

The evidence, when viewed in the light most favorable to the government, was sufficient to allow a reasonable juror to find Williams's guilt for wire fraud and federal funds theft beyond a reasonable doubt. Although Williams testified that she lacked knowledge that her actions were wrongful, the jurors were the sole judges of credibility and were free to discredit her testimony and reject her good faith defense. *See Conklin v. Schofield*, 366 F.3d 1191, 1200–01 (11th Cir. 2004) (finding that by convicting defendant of murder, jury necessarily discredited defendant's testimony and rejected his theory of self defense).

Williams's argument that the evidence is insufficient because the

18

government failed to show financial loss suffered by CNCS also fails. Wire fraud does not require the government to prove actual financial loss or that the defendant benefitted from her scheme. *See Ross*, 131 F.3d at 986 ("Punishment under the wire fraud statute is not limited to successful schemes."). Rather, "[t]he government merely needs to show that the accused intended to defraud his victim and that his or her communications were 'reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *Ross*, 131 F.3d at 986 (quoting *Pelletier v. Zweifel*, 921 F.2d 1465, 1498–99 (11th Cir. 1991)).

We conclude from our review of the record that the evidence was sufficient to prove William's intent to defraud, as well as the requisite elements of wire fraud and federal funds theft. A rational finder of fact could infer from the evidence that Williams knowingly devised and participated in a scheme to defraud CNCS by applying for grant funds with the promise to use them only for approved program expenditures, and that she caused wire transfers to be made in furtherance of her scheme. A reasonable jury also could infer that in her position as an agent of ETA, Williams embezzled, stole, obtained by fraud, intentionally misapplied, or knowingly converted approximately $100,000 of federal funds belonging to the Foster Grandparent Program and Retired Senior Volunteer Program.

C. *Pattern Jury Instructions and Constructive Amendment*

19

Williams contends that the district court's jury instructions created a

constructive amendment to her indictment, violating her due process rights under

the Fifth Amendment.[8]

A constructive amendment to the indictment resulting from the district

court's jury instructions is per se reversible error. *See Stirone v. United States*, 361

U.S. 212, 219, 80 S. Ct. 270, 274, 4 L. Ed. 2d 252 (1960); *United States v. Behety*

32 F.3d 503, 508 (11th Cir. 1994). Under the Fifth Amendment, a defendant has

the right to be tried on felony charges returned by a grand jury indictment. *Stirone*,

361 U.S. at 215, 80 S. Ct. at 272. Only the grand jury may broaden the charges in

the indictment once it has been returned, and the district court may not do so by

constructive amendment. *Id.* at 215–16, 80 S. Ct. at 272. "'A constructive

amendment to the indictment occurs where the jury instructions so modify the

elements of the offense charged that the defendant may have been convicted on a

---

[8] We note that Williams exercised her right to review the district court's instructions prior to the final charge and had it amended to include instructions on her theory of defense. Although Williams suggested several modifications, she did not object to the pattern instructions for 18 U.S.C. § 2. Normally, we review challenges to jury instructions not raised at trial for plain error, reversing only if the instructions were "so clearly erroneous as to result in a likelihood of a grave miscarriage of justice or . . . seriously affect[] the fairness, integrity or public reputation of [the] judicial proceeding." *United States v. Fuentes-Coba*, 738 F.2d 1191, 1196 (11th Cir. 1984). Because Williams raises a constitutional challenge to this instruction under the Fifth Amendment's grand jury requirement, however, we frame our review under the standard set forth in *Stirone v. United States*, 361 U.S. 212, 215–17, 80 S. Ct. 270, 272–73, 4 L. Ed. 2d 252 (1960). Indeed, Williams's challenge goes to whether the district court, in giving those instructions, exceeded its jurisdiction. *McCoy v. United States*, 266 F.3d 1245, 1265 (11th Cir. 2001).

ground not alleged by the grand jury's indictment.'" *United States v. Starke*, 62 F.3d 1374, 1380 (11th Cir. 1995) (quotation marks omitted) (quoting *United States v. Lignarolo*, 770 F.2d 971, 981 n.15 (11th Cir. 1985)).

The indictment charged Williams and her husband, Bunnis Williams, with aiding and abetting each other, in violation of 18 U.S.C. § 2, in conjunction with seven counts of wire fraud and one count of federal funds theft. Williams argues that the district court's jury instructions constructively amended the indictment to allow a jury to find her guilty of aiding and abetting someone other than her husband.

We find no such error from our review of the instructions. The district court instructed the jury as follows:

> [I]f the acts or conduct of an agent, employee, or other associate of a defendant are willfully directed or authorized by such defendant, or if a defendant aids and abets another person by willfully joining together with that person in the commission of the crime, then the law holds such defendant responsible for the conduct of that other person just as though the defendant had personally engaged in the conduct.

R. 6 at 18.

The district court has discretion in the wording and style of the jury instructions, so long as the instructions accurately reflect the law. *Starke*, 62 F.3d at 1380. These instructions provided two ways by which the jury could have found

Williams's guilt: (1) that Williams committed the offenses as a principal through her direction of ETA employees, or (2) that Williams aided another person to commit the offenses, and thus find her criminally liable as an accomplice. Williams and her husband were each charged with the substantive counts, as well as with aiding and abetting each other, and tried together as co-defendants. Thus, these instructions accurately reflected the distinction between principal and accomplice liability from the indictment. Here, the district court read the pattern jury instruction for 18 U.S.C. § 2. While the district court did not specify Bunnis Williams by name in this pattern charge, it did not impermissibly expand the scope of the indictment. We therefore find no error in the district court's instructions.

We must analyze jury instructions in the context of the evidence presented and the government's theory at trial to determine whether a constructive amendment to the indictment has occurred. In the context of the evidence presented in this case, the instructions did not allow the jury to find that the bookkeepers—who were never charged with criminal wrongdoing—were principally culpable for wire fraud and federal funds theft and to base Williams's guilt on her aiding and abetting the bookkeepers *she directed*. Such a reading of the jury instructions is untenable in light of the prosecution's theory and evidence. We therefore reject Williams's claim that the instruction resulted in a constructive

22

amendment and find no error in the district court's use of the pattern instruction.

D.    *Admission of Evidence*

Williams claims, for the first time on appeal, that the district court erred in admitting evidence of her failure to follow the terms and conditions for the federal program grants and other regulatory violations.  Because Williams failed to object timely to the introduction of this evidence at trial, we review this issue for plain error.  *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005).  For the admission of evidence to constitute plain error, the evidence must have been "so obviously inadmissible and prejudicial that, despite defense counsel's failure to object, the district court, *sua sponte*, should have excluded the evidence."  *United States v. Smith*, 459 F.3d 1276, 1300 (11th Cir. 2006) (Tjoflat, J., specially concurring), *cert. denied*, — U.S. — , 127 S. Ct. 990, 166 L. Ed. 2d 747 (2007).

Under the Federal Rules of Evidence, evidence of other crimes, wrongs, or acts is inadmissible character evidence that may not be used to prove a person's propensity to act.  Fed. R. Evid. 404(b).  Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[] . . . ."  *Id.*  In this case, Williams argued a good faith defense, claiming that her misuse of federal grant funds was nothing more than an inadvertent mistake.  In rebuttal, the

23

government offered evidence of Williams's history of non-compliance with federal grant regulations to prove her intent to defraud, establish her knowledge and show lack of mistake. The court gave appropriate instructions, both immediately after it admitted the evidence and in the final charge, limiting the jury's consideration of this evidence to determining Williams's intent and whether she committed the acts by accident or mistake. We therefore find that the district court did not commit plain error by admitting this evidence under Rule 404(b).

E.     *Application of Offense Level Adjustments*

We apply a two-pronged standard to review claims that the district court erroneously applied sentencing guidelines adjustments. First, we review the factual findings underlying the district court's sentencing determination for clear error. *United States v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007). We then review the court's application of those facts to the guidelines *de novo*. *Id.* Although the sentencing guidelines are now advisory after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), "district courts are still required to correctly calculate the appropriate advisory guidelines range." *United States v. Livesay*, 484 F.3d 1324, 1329 (11th Cir. 2007) (per curiam). The ultimate sentence imposed by the district court is reviewed for reasonableness in light of the factors outlined in 18 U.S.C. § 3553(a).

*United States v. Scott*, 426 F.3d 1324, 1328 (11th Cir. 2005).

1.    Aggravating-Role Adjustment

Williams argues that the district court erred in applying the two-level

aggravating-role adjustment per U.S.S.G. § 3B1.1(c) because her husband's

acquittal on all counts precludes any basis for finding that she was an organizer,

leader, manager, or supervisor of one or more other participants.[9]

The federal sentencing guidelines provide for an increase in the defendant's

base offense level by two levels "if the defendant was an organizer, leader,

manager, or supervisor in any criminal activity other than described in

[subsections] (a) or (b)."  U.S.S.G. § 3B1.1(c).[10]  The commentary states that to

qualify for an adjustment under § 3B1.1, "the defendant must have been the

organizer, leader, manager, or supervisor of one or more other participants."

U.S.S.G. § 3B1.1, cmt. n.2.[11]  "Participant" is defined as "a person who is

_____

[9] Because Williams was sentenced on September 18, 2006, all citations to the sentencing commission guidelines, policy statements, commentary, and amendments thereto, are to United States Sentencing Commission, *Guidelines Manual* (2005), which was in effect on that date.

[10] U.S.S.G. § 3B1.1(a) and (b) provide:
>    Based on the defendant's role in the offense, increase the offense level as follows:
>    (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>    (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

[11] The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is

25

*criminally responsible* for the commission of the offense, but need not have been convicted." *Id.*, cmt. n.1 (emphasis added).

The district court would not have been precluded from applying the § 3B1.1 adjustment merely because Williams's husband was acquitted on all counts.[12] At sentencing, the court did not face the same burden of proof—beyond a reasonable doubt—that the jury faced at trial. The court could have applied the § 3B1.1 adjustment if it found by a preponderance of the evidence that Bunnis Williams was criminally responsible for the wire fraud scheme or federal funds theft and that Alma Williams exerted some degree of control, leadership or influence over him. *See United States v. Ndiaye*, 434 F.3d 1270, 1304 (11th Cir.), *cert. denied*, — U.S. — , 127 S. Ct. 128, 166 L. Ed. 2d 95 (2006).

---

inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38, 113 S. Ct. 1913, 1915, 123 L. Ed. 2d 598 (1993); *United States v. Gallo*, 195 F.3d 1278, 1281 (11th Cir. 1999).

[12] At the sentencing hearing, Williams argued against the application of any upward adjustment under § 3B1.1, stating:
> If the Court will recall Ms. Williams and her husband were charged with these offenses. In fact, he specifically said, "they aided and abetted each other." The jury returned a not guilty verdict as to all counts as to Mr. Williams, then we're left with the theory under the government that she aided and abetted herself.

R. 7 at 16. Although Williams did not specifically state at the sentencing hearing that her husband could not be counted as a "participant" because he was acquitted, this argument was adequately preserved her by her objections, through counsel, at sentencing. *See United States v. Massey*, 443 F.3d 814, 819 (11th Cir. 2006) (finding that the defendant had adequately preserved her objections to an upward obstruction of justice adjustment on the basis of her "willfulness" where the defendant's counsel "repeatedly referenced the effect of Zoloft and heroin on her mental state" but "did not specifically utter the words 'intent' or ' mens rea[.]'").

The relevant question, therefore, is whether Bunnis Williams was a "participant," or someone criminally responsible for the commission of Williams's wire fraud and theft. The district court's application of § 3B1.1 to determine that a person is a "participant" is a question law that we review *de novo*, while we review the underlying factual findings for clear error.

In applying the two-level upward adjustment under § 3B1.1(c), the district court considered, inter alia, Bunnis Williams's "participation in the scheme." This record reveals, however, that Bunnis's role was *de minimus* and insufficient to justify a § 3B1.1(c) upward adjustment. At sentencing, the district court found that to accomplish her fraud, Williams directed the accounting entries to cover unauthorized expenses, which included travel expenditures and "loan payments" to Bunnis Williams. The court also found that Bunnis Williams would often take and use of ETA checks without the bookkeepers' knowledge and without justifying his expenses.

Assuming, without deciding, that these factual findings are correct, they do not go so far as to establish, by a preponderance of the evidence, that Bunnis Williams was a criminally culpable "participant" in Williams's wire fraud or federal funds theft. A "participant," as the guidelines defines the term, is "a person who is criminally responsible for the commission of the offense." U.S.S.G. §

27

3B1.1, cmt. n.1. Bunnis's intent to defraud and steal is a requisite threshold question for determining his criminal responsibility. Because grant rules expressly permit commingling of funds in ETA's account and Bunnis Williams was the Chief Executive Officer of ETA, he could have taken funds from ETA's account, without intending to defraud the government or steal federal funds. Although these facts may amount to unethical conduct, they fall short of demonstrating by a preponderance of the evidence that Bunnis Williams was criminally responsible for his wife's wire fraud and federal funds theft. *See United States v. Yates*, 990 F.3d 1179, 1182 (11th Cir. 1993) (per curiam) (reviewing the guidelines commentary to § 3B1.1 and concluding that the district court's statement that the defendant was "involved in an organization that was 'otherwise extensive,'" even if correct, was insufficient as a matter of law to justify an upward adjustment under § 3B1.1(a)).

Because the evidence is insufficient as a matter of law to show that Williams was "an organizer, leader, manager, or supervisor of one or more other participants in criminal activity," we conclude that the district court erred in applying the two-level aggravated-role adjustment under U.S.S.G. § 3B1.1(c).

2.  Abuse of Position of Trust Adjustment

Williams contends that the district court erred in applying the two-level abuse-of-trust adjustment to her base offense level, per U.S.S.G. § 3B1.3, because

28

she did not occupy a position of public or private trust in relation to CNCS.  The sentencing guidelines provide that the sentencing court may increase the defendant's base offense level by two levels if the court finds by a preponderance of the evidence that the "defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  The application note accompanying § 3B1.3 defines "position of public or private trust" as "a position . . . characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G. § 3B1.3 cmt. n.1.

Sentencing and reviewing courts must determine whether a defendant occupied a position of trust that justifies the § 3B1.3 upward adjustment by assessing the defendant's relationship to the victim of the crime.  *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir. 1998).  Therefore, the abuse-of-trust adjustment "'applies only where the *defendant has abused discretionary authority entrusted to the defendant by the victim . . . .*'"  *Id.* at 839 (quoting *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996)); *see also United States v. Walker*, 490 F.3d 1282, 1300 (11th Cir. 2007).  Additionally, we have explained that § 3B1.3 applies in the fraud context where the defendant is in a fiduciary, or other personal trust, relationship to the victim of the fraud, and "'the defendant takes advantage of the

29

relationship to perpetrate or conceal the offense.'" *Garrison*, 133 F.3d at 838

(quoting *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996)).

Where statutory reporting requirements are the only connection between the defendant and the government agency that is the victim, this connection is insufficient to show a fiduciary relationship necessary for a § 3B1.3 adjustment. In *Garrison*, we held that while the government may have been a victim in a Medicare fraud scheme, an abuse-of-trust adjustment was unjustified because the defendant "did not occupy a sufficiently proximate position of trust relative to Medicare." *Id.* at 841. In so holding, we found that "statutory reporting requirements do not create a position of trust relative to a victim of the crime." *Id.* We confirmed this finding in *United States v. Mills*, 138 F.3d 928 (11th Cir. 1998), where we held that the defendants' sentences could not be upwardly adjusted under § 3B1.3 because lying to Medicare did not constitute any breach of public trust. 138 F.3d at 941. In summary, the abuse-of-trust adjustment under § 3B1.1 is justified where the defendant has abused a fiduciary relationship or discretionary authority entrusted by a victim of the crime.

In addition to this fiduciary prerequisite to the abuse-of-trust adjustment, the guidelines specify that "[t]his adjustment may not be employed if an abuse of trust . . . is included in the base offense level or specific offense characteristic."

30

U.S.S.G. § 3B1.3. This is particularly true where, as here, the underlying offense involves fraud because "'there is a component of misplaced trust inherent in the concept of fraud[.]'" *Garrison*, 133 F.3d at 838 (quoting *United States v. Mullens*, 65 F.3d 1560, 1567 (11th Cir. 1995)). We have previously cautioned that "a sentencing court must be careful not to be 'overly broad' in imposing the enhancement for abuse of a position of trust or 'the sentence of virtually every defendant who occupied a position of trust with anyone, victim or otherwise' would receive a section 3B1.1 enhancement." *Id*. (quoting *United States v. Moored*, 997 F.2d 139, 145 (6th Cir. 1993)). Thus, for the abuse-of-trust adjustment to apply in the fraud context, there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario.

The district court found that CNCS, an independent federal agency, was the victim of Williams's wire fraud and federal funds theft. The record supports this finding, especially considering the amount of loss that CNCS suffered. The court determined that Williams occupied a position of trust vis-a-vis CNCS because as ETA's Executive Director, she maintained a position of managerial and professional discretion, had little or no supervision, and exercised a high level of authority over ETA employees. These facts, however, show that ETA, not CNCS,

31

entrusted Williams with discretionary authority in the financial management of its funds. [13]

As to CNCS, Williams did not have any discretion as to how federal funds were spent. Rather than permit Williams to use her independent judgment in making program expenditures and later charge them to CNCS in a reimbursement-type scenario, CNCS awarded grant funds only after reviewing and pre-approving a specific line-item budget. Williams's only obligation was to provide accurate progress status reports demonstrating that ETA spent grant funds in the manner required by CNCS. The record does not show that CNCS—the victim—entered into a fiduciary relationship with Williams and entrusted her with discretion in allocating the federal funds by awarding the grants to ETA.

Nor did the district court find that CNCS placed a special trust in Williams

---

[13] William appears to argue, on the basis of *United States v. Mills*, 138 F.3d 928 (11th Cir. 1998), that CNCS is the only possible victim in this case. Despite our holdings in *Garrison* and *Mills*, it does not follow that, as a matter of law, the United States is the only possible victim of a fraudulent scheme worked on a federal agency. In *Mills*, we read *Garrison* to "apparently require[] us to hold that the United States is, as a matter of law, the only possible victim of a Medicare-fraud crime and that therefore [a] private position of trust is irrelevant." *Id.* In *United States v. Linville*, 228 F.3d 1330 (11th Cir. 2000) (per curiam), we declined to take this position, holding that *Garrison* and *Mills* did not compel us to find that only a federally insured bank could be a victim in a bank fraud scheme. 228 F.3d at 1332. Taking a more reasonable approach, we instead held that "more than one person could, depending on the case's facts, be the victim who reposes trust in the defendant." *Id.* Thus, the probation officer (who prepared the PSI) and the district court could have considered and determined that there were additional victims, such as ETA. However, that is not what happened here. Instead, in this case, the PSI reported without objection by the government that "[t]he victim in this case is the Corporation for National and Community Service, an independent federal agency" and the district court simply adopted the findings of the PSI.

32

above her obligation to adhere to the terms and conditions for the grants. The district court justified the § 3B1.3 adjustment because CNCS, by administering the grants, relies on the integrity and honesty of the grantees to use the funds appropriately and as outlined in the approved line item budget. Williams's abuse of this trust as to CNCS is already accounted for in the base offense level for her convictions of wire fraud and federal funds theft. The promise of veracity, often under penalty of perjury, underlies nearly every loan application, grant, or other financial transaction with the federal government. It could not have been intended that § 3B1.3 apply in every case where the defendant receives pecuniary gain by lying to the government.

Because there is no evidence that CNCS entrusted Williams with discretionary authority or placed a special trust, akin to that of a fiduciary, in Williams, the district court erred in applying the abuse-of-trust adjustment based on Williams's relationship with CNCS. On remand, the district court shall re-calculate Williams's advisory Guidelines sentence without the § 3B1.3 adjustment.

3.   Obstruction of Justice Adjustment

The district court applied a two-level obstruction-of-justice adjustment to Williams's base offense level because Williams began to amend the accounting system to remove some of the unapproved expenditures after learning of the

33

allegations and the pending investigation. Williams argues that she bore no fraudulent intent when she ordered the reallocation of expenses in Quickbooks, and that she was only correcting her prior misunderstanding of how program expenditures should be classified under government regulations. We reject Williams's argument.

Section § 3C1.1 provides for an upward adjustment by two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction . . . ." U.S.S.G. § 3C1.1. An example of such obstructive conduct is "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or official proceeding." U.S.S.G. § 3C1.1, cmt. n.4. Notwithstanding Williams's assertion of good faith, there is sufficient evidence in the record to support the district court's finding that she did in fact direct the bookkeepers to alter the ETA's accounting records to conceal the unapproved expenditure of federal funds. The district court's finding was not clearly erroneous, and we affirm the district court's application of the § 3C1.1 adjustment.

## III. CONCLUSION

Williams's convictions for five counts of wire fraud and one count of federal

funds theft do not violate the Fifth Amendment Double Jeopardy Clause because each count satisfies the *Blockburger* test.  Neither the district court's admission of evidence nor its final jury charge constituted error, and there is sufficient evidence to support Williams's convictions.  For the foregoing reasons, we affirm Williams's convictions.  As to Williams's sentence, the district court's factual findings do not justify application of adjustments for aggravated role or for abuse of trust.  Therefore, we vacate Williams's sentence and remand for resentencing without the upward adjustments under U.S.S.G. §§ 3B1.1(c) and 3B1.3.

AFFIRMED, IN PART; VACATED AND REMANDED, IN PART.

HULL, Circuit Judge, concurring in part and dissenting in part:

I concur in full in Sections I and II(A)-(D), (E)(2) and (E)(3) of the majority's opinion. However, as to Section II(E)(1), I conclude that the district court's application of the two-level role enhancement must be affirmed and thus respectfully dissent as to the reversal in Section II(E)(1).

As the majority opinion notes, Williams on appeal argues that the district court improperly found that her husband was a "participant" for purposes of applying the role enhancement in U.S.S.G. § 3B1.1(c).

Section 3B1.1(c) authorizes a two-level increase in a defendant's offense level if the defendant was the "organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b) . . . ."[14] U.S.S.G. § 3B1.1(c). To qualify for a § 3B1.1(c) role enhancement, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 cmt. n.2. As the majority opinion notes, a "participant" is someone who "is <u>criminally responsible</u> for the commission of the offense, but

_____

[14]Subsection (a) of § 3B1.1 provides for a four-level offense level increase if the defendant was the "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a). Subsection (b) provides for a three-level offense level increase if the defendant was the "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(b). Thus, the criminal activity implicated by a subsection (c) two-level increase involves less than five participants and is not "otherwise extensive."

36

need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1 (emphasis added).

According to Williams on appeal, her husband could not be considered a participant because he was acquitted by the jury. I fully agree with the majority opinion that the district court may properly consider an acquitted co-defendant, such as Williams's husband, to be a participant for § 3B1.1 purposes.[15]

Williams's argument on appeal that the district court improperly counted her husband as a participant is limited to her husband's status as a co-defendant acquitted by the jury. Williams's brief does not argue that the trial evidence was insufficient to support a finding by a preponderance of the evidence that her husband was knowingly involved in the criminal activity for purposes of the § 3B1.1(c) sentencing enhancement. Thus, I would not reach this issue and would

---

[15]Williams did not advance the acquitted-husband argument in the district court. Instead, Williams's objection to the § 3B1.1(c) role enhancement at sentencing was that she had relied in good faith on her bookkeepers and accountant to advise her as to the availability and use of the federal funds and that she was essentially innocent. Because Williams did not object to the role enhancement on the husband-related grounds urged on appeal, our review should be for plain error. See United States v. Massey, 443 F.3d 814, 819 (11th Cir. 2006) (explaining that a defendant "fails to preserve a legal issue for appeal if the factual predicates of an objection are included in the sentencing record, but were presented to the district court under a different legal theory"); United States v. Gallo-Chamorro, 48 F.3d 502, 507 (11th Cir. 1995) ("To preserve an issue for appeal, a general objection or an objection on other grounds will not suffice."); United States v. Zinn, 321 F.3d 1084, 1088 (11th Cir. 2003) (concluding that, if a defendant fails to "clearly articulate a specific objection during sentencing," the objection is waived and the issue is reviewed only for plain error). In any event, the acquitted-husband argument advanced by Williams on appeal must be rejected under either standard of review – whether de novo or plain error.

affirm the district court's application of the § 3B1.1(c) two-level enhancement.[16]

---

[16]Williams challenges the application of the role enhancement as impermissible double-counting. This argument is not addressed by the majority opinion, and, in any event, it is meritless and does not warrant discussion.